[No. A031310. First Dist., Div. Four. Oct. 27, 1987.]

THE PEOPLE, Plaintiff and Respondent, v.
AUDIE G. KING, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts III and IV.

COUNSEL

Dale Dombkowski, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Martin S. Kaye and Gerald A. Engler, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

CHANNELL, J.—A jury convicted appellant Audie G. King of false imprisonment, assault with a deadly weapon, and rape. (Pen. Code, §§ 236, 245, subd. (a)(1), 261, subd. (2).) He was sentenced to six years in state prison and ordered to pay a $100 restitution fine. He appeals, contending

that the trial court erred (1) by denying his *Wheeler* motion (*People* v. *Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748]); (2) by limiting his right of cross-examination; and (3) by failing to state proper reasons for its sentence choice. We affirm the judgment.

## I.  FACTS

### A.  *The Prosecution's Case*

In late November 1984, appellant Audie G. King was a waiter at the Broadmoor Hotel on Sutter Street in San Francisco, a residential hotel for senior citizens. Janet M. was a waitress there. Like many Broadmoor employees, King and Janet lived on the premises. Janet shared a room with another woman, Sega Bird.

King and Janet met at a theater once a few blocks from the hotel to see a movie. The two came separately and Janet paid her own admission; she did not consider this to be a date. They had a couple of beers after the movie, at King's suggestion. After they walked back to the hotel, each went to his or her own room. There was no physical contact between Janet and King that night.

On another occasion, they both went with three other hotel employees for dinner. Janet paid for her own meal and when King tried to put his arm around her, she moved away from him. Returning to the hotel, most of this group went to King's room to talk and watch television. After a short time, Janet got tired, left, and went to bed in her own room. King had been coming on to her, so Janet told him that she had only platonic relationships with people at the hotel. Janet did not consider this to be a date.

On the night of November 28-29, 1984, Janet went to sleep about 11:30 p.m. Her room was locked, but Bird entered the room and left the door unlocked. About 2 a.m., Bird saw King and told him, in response to his question, that Janet was asleep in her room. He appeared to have been drinking. Bird told King to go to see Janet if he liked—that the door was unlocked.

King went to Janet's room. She was still asleep, but the light from the hall woke her and she became aware of King's presence. When she asked what he was doing there, he climbed on top of her. She asked him to leave her alone, but he told her he wanted her to love him. Janet used all her physical capabilities to get him off of her. King pushed her down, smothering her so that she could not breathe, and raped her. He also put his mouth on her vagina.

Once, Janet got away from King and headed for the door, but he prevented her from leaving. He started choking her and hit her head against the wall so hard that a map fell off the wall. King told Janet "[D]on't fuck with me," and pushed her back on the bed. She blacked out for a moment. By this time, Janet was limp and numb, and King raped her again.

Later, Janet made another try for the door. She opened the door enough to get one leg out into the hall; King tried to close the door on her leg and Janet started to scream. Mark Walco, her neighbor across the hall, heard Janet and opened his door. He saw Janet sobbing with her head and one leg sticking out of the door of her room. Walco pushed the door open and saw Janet was clad only in a tee-shirt. King was in Janet's room, and he told Walco "It's all right now, we won't fight anymore." A third person brought Janet his pants, and Walco took Janet to his room where she told him what had happened. Later, the police arrived and arrested King. Janet was taken to a hospital. She had a contusion on her head; bruises on her arms, back, sides, and legs; and she was vomiting.

King was charged with oral copulation, assault with a deadly weapon, false imprisonment, and two counts of rape. (Pen. Code, §§ 236, 245, subd. (a)(1), 261, subd. (2), 288a, subd. (c).) He pleaded not guilty to each count. Before trial, one count of rape was dismissed on the People's motion.

## B.   *Voir Dire*

During voir dire, the People exercised peremptory challenges to exclude several prospective jurors, including two Black men, Mr. Prescott and Mr. Rand. King then made a *Wheeler* motion (see *People* v. *Wheeler, supra,* 22 Cal.3d 258), contending that the People were systematically excluding Black jurors on the basis of group bias. The trial court found that a prima facie case had been shown for the defense and asked the prosecutor to state his reasons for excluding these jurors.[1]

The prosecutor stated that he excused Mr. Prescott, a man with two grown children, for the same reasons he excluded two non-Black jurors— because he was an older man. He explained that given "the nature of this case I don't feel it's in the best interest of the People to have older men on the jury, regardless of what race they are. . . . [¶] We're talking about a situation where a young woman is living under circumstances that an older man with traditional values might, at least in my opinion, be inappropriate and . . . they might consider she is putting herself in a situation where she,

---

[1] King was not Black; the record does not reveal Janet's race.

so to speak, is asking for it, or putting herself in a situation that they think is inappropriate, and whatever happens to her is her own fault."

On the exclusion of Mr. Rand, the prosecutor noted that he was a younger Black man who was self-employed as a bicycle repairman whose wife worked at the Department of Motor Vehicles; and that the Rands had a child. The prosecutor got the impression that the wife was "the primary source of income in the family, and . . . at least in my mind, that his wife was the domineering force, so to speak, as far as economic value is concerned in his household, and I felt that he may have a rather unsympathetic point of view or attitude toward the victim in this case."

After hearing the prosecutor's reasons for excluding these jurors, the court explained that, under *Wheeler,* if it is "convinced that there was not sufficient justification for excusing those three individuals, and that the present composition of the jury is not representing a cross section of the community, that the defendant would be denied a fair trial, and that there's been an attempt to systematically exclude a minority from the jury," then a mistrial would be in order. The trial court noted that he had, in the past, granted mistrials on this basis when the People had, in his judgment, "not given just reasons for excusing members of a minority group."

Applying this standard to the prosecutor's exclusion of Rand and Prescott, the trial court noted that the prosecutor "has stated his reasons. I can't second guess his evaluation of those people in the sense that in his opinion he feels that those people would not give his client a fair trial, he's justified in exercising a peremptory challenge." The court went on to say that "on the basis of this record, I don't feel that I can conclude that there has been an intentional, willful exclusion of a minority group that would justify the . . . granting [of] a mistrial, because what [the prosecutor] says is correct in the sense that these were the responses of the jurors and he has stated his reasons." As jury selection was not then complete, the court noted that if the prosecutor excluded any more minority jurors, it would reconsider its ruling on mistrial.

## C. *The Defense Case*

After the prosecution presented its case, King testified on his own behalf about his relationship with Janet. When they walked back to the hotel after seeing a movie, he had his arm around her. Before they went into the hotel, they talked and kissed for 10 or 15 minutes. King walked Janet to the door of her room, kissed her goodnight, and went to his own room. The next day, they went for a walk and held hands. The following day, they went to dinner and to a discotheque with friends. Later, King and Janet bought

some beer and went to King's room where they met the others. When King kissed Janet, she did not resist in any way. She did not tell him she just wanted a platonic relationship. King thought they had a "sweetheart" relationship.

King testified that on the night of November 28-29, he went out and had a couple of drinks with his friend Manuel. They played pool until about 1:30 or 1:45 a.m., then went home. In the lobby of the living area, he saw Sega Bird. The three of them went to Manuel's room to talk. Bird asked King how he and Janet were getting along; she said Janet liked him and asked why King wasn't with Janet. Bird said that Janet wouldn't mind if he went to see her because she was not working the next day. She told King that the door to the room was open.

King told the jury that he went to talk to Janet. He knocked on her door and thought he heard a response. He opened the door a little bit and Janet looked up and said, "Oh, it's you." King asked her if she wanted to go back to sleep, but she said it was all right for him to come in. He sat on her bed and they began to talk. They began to kiss, King fondled Janet's breasts and genitals, and he placed his finger inside her vagina. Janet continued to kiss King; she did not resist him at any time.

King testified that he believed Janet wanted to have sexual intercourse with him. They did so twice.[2] The second time, Janet suddenly pushed him away, saying "No, no." King got up and asked her what was wrong, but she wouldn't talk to him. As he was putting on his clothes, Janet headed toward the apartment door and opened it. King blocked her exit because she had on only a tee-shirt that came to her waist. Janet called for someone to "get this man out of my room," and she hit her head on the wall near the door trying to leave the room. At this point, King stopped trying to prevent her from leaving. He denied raping Janet, putting his mouth on her vagina, hitting her head against the wall, or striking her at any time. Other witnesses testified that King and Janet were "cozy" with one another, that they went out together for walks more than once, and that King would put his arm around Janet's shoulder without resistance.

## D. *Verdict and Sentence*

Both counsel argued to the jury that the issue was one of credibility—did the jury believe Janet or King? The jury found King guilty of all counts except the oral copulation charge. The probation department recommended

---

[2] King testified that he was certain he did not ejaculate, but the physician who examined Janet after the incident found traces of semen in her pubic area.

against a grant of probation. The trial court agreed and imposed a middle term of six years for the rape; sentence for the other two offenses was stayed. (See Pen. Code, § 654.) King filed a timely appeal from the judgment.

## II. *WHEELER* ERROR

██ First, King contends that the trial court denied him his constitutional right to be tried by a jury drawn from a representative cross-section of the community. He claims that the prosecutor used peremptory challenges to remove two Black jurors from the panel solely on the basis of race, and that the trial court erred when denying his motion challenging the prosecutor's conduct.

██ Under *Wheeler,* a prosecutor may not use peremptory challenges to remove prospective jurors for "group bias"—solely because they are members of an identifiable racial group. (*People* v. *Wheeler, supra,* 22 Cal.3d 258, 276-277; see *People* v. *Trevino* (1985) 39 Cal.3d 667, 681, 686 [217 Cal.Rptr. 652 [704 P.2d 719]; *People* v. *Hall* (1983) 35 Cal.3d 161, 166-167 [197 Cal.Rptr. 71, 672 P.2d 854]; see also *Batson* v. *Kentucky* (1986) 476 U.S. 79, 89-90 [90 L.Ed.2d 69, 82-83, 106 S.Ct. 1712].)[3] Instead, peremptory challenges are to be based on "specific bias"—that bias stemming from individual biases related to the peculiar facts or the particular party at trial. (See *People* v. *Wheeler, supra,* at pp. 274, 276-277, fn. 17.)

██ We begin with the presumption that the prosecutor exercised his peremptory challenges on a constitutionally permissible ground. (*People* v. *Wheeler, supra,* 22 Cal.3d at p. 278; see *People* v. *Hall, supra,* 35 Cal.3d at p. 167; see also *Batson* v. *Kentucky, supra,* 476 U.S. at p. 86, fn. 18 [90 L.Ed.2d at pp. 85, 86].) If the defendant makes a prima facie case of discrimination to the satisfaction of the trial court, the burden of proof shifts to the prosecutor to show, if he can, that the peremptory challenges in question were not predicated on group bias alone. (*People* v. *Wheeler, supra,* at pp. 280-281; see *People* v. *Hall, supra,* at p. 167; see also *Batson* v. *Kentucky, supra,* 476 U.S. at pp. 93-94 [90 L.Ed.2d at pp. 85-86].)[4] To justify his exclusions, the prosecutor must satisfy the court that he exercised his peremptory challenges on grounds that were "reasonably relevant to the

---

[3] To qualify for similar protection under the United States Constitution, the defendant must show that he is a member of the group being singled out for differential treatment. (*Batson* v. *Kentucky* (1986) 476 U.S. 79, 95 [90 L.Ed.2d 69, 86-87].) As King is of a different race than the excluded jurors, *Batson* is inapplicable. However, its principles are important guideposts for our consideration to the extent that they relate to issues presented in *Wheeler*.

[4] As the People do not dispute that King made a prima facie case of discrimination, we need not discuss whether the trial court properly found that a prima facie case was established.

particular case on trial or its parties or witnesses—i.e., for reasons of specific bias . . . ." (*People* v. *Wheeler, supra,* at pp. 281-282; see *People* v. *Turner* (1986) 42 Cal.3d 711, 720 [230 Cal.Rptr. 656, 726 P.2d 102]; *People* v. *Hall, supra,* at p. 167; *People* v. *Chambie* (1987) 189 Cal.App.3d 149, 154 [234 Cal.Rptr. 308]; see also *Batson* v. *Kentucky, supra,* 476 U.S. at pp. 98-99 [90 L.Ed.2d at pp. 88-89].)

■ Ultimately, the trial court must determine the sufficiency of the prosecutor's reasons. As the California Supreme Court has instructed, when evaluating whether the prosecutor has demonstrated specific bias, "we rely on the good judgment of the trial courts to distinguish bona fide reasons for such peremptories from sham excuses belatedly contrived to avoid admitting acts of group discrimination." (*People* v. *Wheeler, supra,* 22 Cal.3d at p. 282; see *People* v. *Turner, supra,* 42 Cal.3d at p. 721; *People* v. *Trevino, supra,* 39 Cal.3d at pp. 681, 686; *People* v. *Hall, supra,* 35 Cal.3d at pp. 167-168.) The trial court's finding on whether the defendant has established purposeful discrimination is a finding of fact entitled to appropriate deference from a reviewing court. To the extent that the trial court's findings turn on an evaluation of credibility, a reviewing court ordinarily should give those findings great deference. (*Batson* v. *Kentucky, supra,* 476 U.S. at pp. 98-99, fn. 21 [90 L.Ed.2d at pp. 88-89]; see *People* v. *Turner, supra,* at p. 720, fn. 6; *People* v. *Brewster* (1986) 184 Cal.App.3d 921, 925 [229 Cal.Rptr. 352]; *People* v. *Clay* (1984) 153 Cal.App.3d 433, 456 [229 Cal.Rptr. 352].)

This deference to the trial court is particularly appropriate in the context of evaluating the basis of a peremptory challenge. Jury selection is, in itself, an inexact science, based as often on hunches and inferences about human behavior as on hard facts. By their very nature, peremptory challenges particularly lend themselves to the application of popular psychology, the consideration of unarticulated values, and the varied experiences—both at trial and in life—of the attorneys who use them. As a result, a decision to exercise a peremptory challenge may be based on factors that an appellate court cannot see when reviewing a cold record.

In practical terms, observing potential jurors may reveal as much about them as counsel may learn from listening to them. As if to underscore the importance of the visual aspect of jury selection, the legal term used to describe this process—"voir dire"—is itself a combination of two French verbs meaning "to see" and "to say." (See Cassell's French-English Dict. (1982) pp. 259-260, 757.) The importance of observation during voir dire extends to court and counsel alike. During voir dire, the trial judge has had an opportunity to observe counsel's behavior as well as the demeanor of prospective jurors. These observations inherently affect the trial court's ruling on a *Wheeler* motion. On appeal, without having had the benefit of

observing voir dire as the trial court has had, we should defer to the trial court on *Wheeler* motions—especially when the case presented on appeal is a close one.

■ During the King voir dire, prospective jurors Prescott and Rand answered questions about themselves. Based on this information, the prosecutor gave reasons for his decision to exclude these jurors. He told the trial court that he inferred that Prescott, an older man who likely had traditional values, might consider that the victim in this case—living in circumstances that Prescott might feel was inappropriate for a young woman—was "asking" to be raped. He also explained that he inferred from the fact that Rand's wife was the principal breadwinner, that she was the dominant force in their home and that this, in turn, might make Rand less sympathetic to the female crime victim in this case. Admittedly, the prosecutor's inferences were somewhat speculative. ■ However, the California Supreme Court has affirmed that "a peremptory challenge may be predicated on a broad spectrum of evidence suggestive of juror partiality, [ranging] from the obviously serious to the apparently trivial, from the virtually certain to the *highly speculative.*" (*People* v. *Wheeler, supra,* 22 Cal.3d at p. 275, italics added; see *People* v. *Hall, supra,* 35 Cal.3d at p. 167; *People* v. *Moss* (1986) 188 Cal.App.3d 268, 273, 278-281 [233 Cal.Rptr. 153]; *People* v. *Harvey* (1984) 163 Cal.App.3d 90, 112, fn. 10 [208 Cal.Rptr. 910] [although some suggestion of specific bias appears in the record, peremptory challenges were not improper].)

■ We need not agree with the prosecutor's assumptions or the sometimes tenuous inferences on which they are based. (See *People* v. *Harvey, supra,* 163 Cal.App.3d at p. 112, fn. 10.) Our role is to determine whether the trial court acted within its authority when it decided that the prosecutor's exclusions were not based on group bias. *Wheeler* " 'requires trial judges to make difficult and often close judgments. They are in a good position to make such determinations, however, on the basis of their knowledge of local conditions and of local prosecutors.' " They are also well situated to bring to bear on this question their powers of observation, their understanding of trial techniques, and their broad judicial experience. "We are confident of their ability to distinguish a true case of group discrimination by peremptory challenges from a spurious claim interposed simply for purposes of harassment or delay." (*People* v. *Wheeler, supra,* 22 Cal.3d at p. 281; see *People* v. *Boyd* (1985) 167 Cal.App.3d 36, 50 [212 Cal.Rptr. 873] [opinion by Eagleson, J.]; see also *Batson* v. *Kentucky, supra,* 476 U.S. at p. __ [90 L.Ed.2d at p. 88].) The trial judge's preliminary comments reveal that he understood his obligations under *Wheeler* and was prepared to exercise his authority to curb an excessive prosecutor, if the case merited

this action. We are satisfied that the trial court acted within its authority when it denied King's *Wheeler* motion.

King argues that if the prosecutor truly believed that Prescott were biased against young women who place themselves in social situations in which they might become rape victims, he would have asked Prescott about this. However, in some instances, a prosecutor cannot establish reasons for exclusion by normal methods of proof or cannot do so without causing embarrassment to the challenged venireman and resentment among remaining jurors. (*People* v. *Hall, supra,* 35 Cal.3d at p. 167.) *Wheeler* and its progeny do not compel the prosecutor to make the sort of inquiry King would require before the People may exercise a peremptory challenge. Also, the evaluation of a prosecutor's reasons for excluding jurors must be made in the context of the facts of the particular case. (*People* v. *Wheeler, supra,* 22 Cal.3d at pp. 281-282; see *Batson* v. *Kentucky, supra,* 476 U.S. at p. 98, fn. 20 [90 L.Ed.2d at pp. 88-89].) The charged offense was a rape by a person known to the victim, and King's defense was one of consent. The case turned on the credibility of the two key witnesses—the victim and the defendant. Although the prosecutor's reason for excluding Prescott might seem implausible if viewed in a vacuum, it is reasonable when considered in the context in which the prosecutor worked.

Next, King contends that the prosecutor was inconsistent in his use of age to exclude jurors. Before King made the *Wheeler* motion, the prosecutor excluded three older men who were on the panel—one Black, one White, and one Asian. At the time of the motion and the hearing, jury selection was not complete. When the jury was sworn, it included a retired man, Mr. Hanley, whom the prosecutor had not excluded. King claims that this proves *Wheeler* error—that the prosecutor was not excluding older men on an evenhanded basis. We disagree. The fact that the prosecutor did not exclude *this* retired juror was not known until after the *Wheeler* motion had been denied. The trial court had no opportunity to consider this evidence. It had already made clear to King that it would reconsider its motion if evidence of group bias presented itself later in the jury selection process. However, King did not renew his *Wheeler* motion after voir dire was complete. Furthermore, we cannot use evidence of subsequent events to evaluate earlier decisions of the trial court.[5] Insofar as the evidence is relevant to our review of the propriety of the prosecutor's reasons, we do not think that the prosecutor must exclude *every* older man from his jury to demonstrate a lack of group bias. The fact that he applied his reason—the age of the juror—to exclude jurors of several races is sufficient.[6]

---

[5] King himself urges this point in his reply brief when he challenges the Attorney General's reference to the exclusion of another retired juror after the *Wheeler* motion was made.

[6] We construe *People* v. *Trevino, supra,* 39 Cal.3d at page 691, as holding that, in a proper case, age may be a legitimate basis for excluding jurors.

■ Finally, King claims that the trial court erred by refusing to inquire sufficiently into the prosecutor's reasons. He contends that by refusing to second-guess the prosecutor's opinion that Prescott and Rand would not give the People a fair trial, the trial court deferred to the prosecutor. The record does not support King's claim. The trial court said that it could not second-guess the prosecutor's *evaluation* of Rand and Prescott—in effect, that the trial judge could not substitute his own judgment about whether these jurors could be fair for that of the prosecutor. *Wheeler* does not require the trial court—or the appellate court—to do so; rather, it requires courts to determine whether the prosecutor's reasons are "reasonably relevant to the particular case on trial or its parties or witnesses . . . ." (*People v. Wheeler, supra,* 22 Cal.3d at pp. 281-282.) The prosecutor's reasons were relevant to King's case, and were neither implausible nor suggestive of bias. The trial court did not abdicate its responsibility under *Wheeler*; it ruled that, on the evidence presented, it could not "conclude that there [had] been an intentional, willful exclusion of a minority group that would justify . . . granting a mistrial . . . ." The trial court fulfilled its legal obligations and acted within its authority in denying the *Wheeler* motion.

### III., IV.*

. . . . . . . . . . . . . . . . . . . . . .

The judgment is affirmed.

Anderson, P. J., concurred.

POCHÉ, J.—I respectfully dissent from the majority's conclusion that no *Wheeler*[1] error occurred below.

### A.

As the People and this court in essence concede (see majority opn., *ante,* p. 931, fn. 4) there can be no question but that a prima facie case of group bias was established when the defense showed that three of the four peremptory challenges exercised by the prosecutor removed all the Blacks from the venire. (Accord *People v. Motton* (1985) 39 Cal.3d 596, 605 [217 Cal.Rptr. 416, 704 P.2d 176] [prima facie case found where five of eight challenges used to remove all Black jurors]; *People v. Hall* (1983) 35 Cal.3d 161, 168 [197 Cal.Rptr. 71, 672 P.2d 854] [same]; *People v. Moss* (1986) 188

---

*See footnote, *ante,* page 923.
[1] *People v. Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748].

Cal.App.3d 268, 275 [233 Cal.Rptr. 153] [prima facie case found where two peremptory challenges used to remove all Black jurors].)

Once the trial court finds a prima facie case has been made, as it did here, "the burden shifts to the other party to show if he can that the peremptory challenges in question were not predicated on group bias alone." (*People* v. *Wheeler, supra,* 22 Cal.3d at p. 281, fn. omitted.) In determining whether the prosecutor has satisfied this burden the trial court must review the proffered reasons not in terms of "judgment' or 'sincerity'" but in terms of whether the "ground of challenge was a specific bias on the part of the individual juror." (*Id.* at p. 284, fn. 32; accord *People* v. *Trevino* (1985) 39 Cal.3d 667, 688 [217 Cal.Rptr. 652, 704 P.2d 719].) Bias, in the *Wheeler* context, is defined as "a bias relating to the particular case on trial or the parties or witnesses thereto." (*People* v. *Wheeler, supra,* at p. 276; accord *People* v. *Trevino, supra,* at p. 689.)

On review of a trial court's determination that the prosecutor has met his burden of proof, my colleagues see an appellate court's role as limited to giving great deference to the trial court's findings. (See majority opn., *ante,* pp. 932-933.) Ordinarily that is the rule. (*People* v. *Turner* (1986) 42 Cal.3d 711, 720, fn. 6 [230 Cal.Rptr. 656, 726 P.2d 102], citing *Batson* v. *Kentucky* (1986) 476 U.S. 79, 98, fn. 21 [90 L.Ed.2d 69, 89].) But refusing to give absolute deference to the trial court is precisely what the California Supreme Court has done in three of its more recent *Wheeler* cases: *Hall, Trevino* and *Turner.* Each case was a reversal. If those nondeferential actions by the high court were not sufficient to make the rule for reviewing courts clear, the Supreme Court has spelled matters out by explaining that ordinarily giving deference does not mean inevitably giving deference. (*People* v. *Turner, supra,* at p. 720, fn. 6.) The court went into detail: "in some cases the reviewing court may conclude that the explanation is inherently implausible in light of the whole record. . . . [T]he issue whether a given explanation constitutes a constitutionally permissible—i.e., nondiscriminatory—justification for the particular peremptory challenge remains a question of law." (*Ibid.*)

Thus, as I understand the directions given by the California Supreme Court, the function of the appellate court is to do more than recite the mantra—defer to the trial court—defer to the trial court—defer to the trial court. Instead, our function is (a) to independently determine whether a given explanation is inherently implausible, and (b) to do so in light of the entire record.

The whole record shows the prosecutor to have been both explicit and clear in his sole reason for challenging Mr. Prescott, a Black prospective

juror: "With regard to Mr. Prescott, who was an older man, . . . I excused him for the same reasons I excused Mr. Small and Mr. Panelo, who were both older men, both Mr. Small and Mr. Panelo being retired individuals. [¶] *Given the nature of this case I don't feel it's in the best interest of the People to have older men on the jury, regardless of what race they are.*" (Italics added.)

On its face the prosecutor's explanation for this challenge of Juror Prescott appears to meet the definition of specific bias relating to a particular witness, here the victim. Were that the entire record before this court, I would find the prosecutor had sufficiently rebutted the inference of impermissible group bias.[2] But that is not the whole record before this court, and it is the whole record that we are required to review to determine whether the prosecutor's explanation is inherently implausible. (*People* v. *Turner, supra,* 42 Cal.3d at p. 720, fn. 6.)

What the whole record reveals is that things changed once the prosecutor hurdled the *Wheeler* motion by explaining it was not Mr. Prescott's race but rather his age—and solely his age—which had triggered the challenge. Suddenly, age did not matter anymore and a retired White man, Juror Hanley, was allowed to remain on the jury. Thus, the characteristic trait had been explained at the time of the *Wheeler* motion to be universally disqualifying—("Given the nature of this case I don't feel it's in the best interest of the People to have older men on the jury, regardless of what race they are")—suddenly became qualifying. What a difference a White man makes.

The majority refuses to consider evidence of the retention of Juror Hanley because that occurred after the denial of the *Wheeler* motion. (See majority opn., *ante,* pp. 934-935.) As I have attempted to make clear, however, *Turner* mandates that we consider the handling of Juror Hanley because that is part of the whole record.

---

[2] An issue yet to be resolved by the California Supreme Court is whether age groupings— e.g., young persons, or retired persons—can be deemed cognizable groups for purposes of jury composition. If I were writing on a clean screen, I would find that age groupings are cognizable classes which cannot be systematically excluded from the venire by the arbitrary use of peremptory challenges.

However, I have no quarrel with the exercise of a peremptory challenge premised on a juror's age—young or old—where the prosecutor is able to demonstrate a specific bias arising out of that age. Thus in this case, had the prosecutor been consistent in his challenges of older men, I would be inclined to find that the prosecutor had rebutted the prima facie case of group discrimination based on age because the prosecutor had identified a specific bias against his victim. However, if the prosecutor merely challenges older people on a jury because he believes them as a class to be lazy or dull, then, in my view, the prima facie case would not have been rebutted.

A prosecutor's disparate treatment of the members of the excluded group and the unchallenged jurors who have the same characteristics has been deemed strong indicia of group bias. (*People* v. *Hall, supra,* 35 Cal.3d at p. 168; accord *People* v. *Turner, supra,* 42 Cal.3d at p. 721; *People* v. *Trevino, supra,* 39 Cal.3d at pp. 690-693.) As I review this prosecutor's words as measured against his actions, his disparate treatment of the older jurors failed to rebut, as a matter of law, the defense's prima facie case of group bias. Stated another way, the prosecutor's reason for challenging Mr. Prescott was, in the polite words of the California Supreme Court, "inherently implausible."[3]

Because *Wheeler* error is prejudicial per se (*People* v. *Turner, supra,* 42 Cal.3d at p. 728; *People* v. *Wheeler, supra,* 22 Cal.3d at p. 283), I would reverse.

A petition for a rehearing was denied November 18, 1987, and appellant's petition for review by the Supreme Court was denied January 7, 1988.

---

[3] I therefore have no occasion to consider whether the trial court had a sua sponte obligation to reopen its consideration of the *Wheeler* motion once the prosecutor retained a juror who so obviously exhibited the characteristic the prosecutor just a little earlier has described as absolutely disqualifying. Nor need I consider whether defense counsel's failure to renew the *Wheeler* motion at that time constituted ineffective assistance of counsel.