[Nos. F006947, F007113. Fifth Dist. Apr. 15, 1988.]

THE PEOPLE, Plaintiff and Respondent, v.
WILLIAM RICHARD BARBER et al., Defendants and Appellants.

**[Opinion certified for partial publication.†]**

---

† Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of part II.

**COUNSEL**

Cynthia Calvert and Christopher Blake, under appointments by the Court of Appeal, for Defendants and Appellants.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Jane N. Kirkland, Maureen S. Dunn and Edmund D. McMurray, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

MARTIN, J.—On October 24, 1985, the Tulare County District Attorney filed information No. 23508 charging appellants William Richard Barber and Rebecca Bledsoe with selling or furnishing cocaine in violation of Health and Safety Code section 11352 (count I); transporting cocaine in violation of Health and Safety Code section 11352 (count II); possessing cocaine in violation of Health and Safety Code section 11350 (count III); and, as to appellant Barber only, carrying a loaded firearm in a vehicle while in a public place and on a public street in an incorporated city in violation of Penal Code section 12031, subdivision (a), a misdemeanor (count IV).

A jury trial commenced on February 10, 1986. The trial court denied Bledsoe's motion to sever her trial from appellant Barber's trial and granted her motion to sever count IV. Thus, the ultimate disposition of count IV is not a part of this appeal.

The jury found Bledsoe not guilty of counts I and II but convicted Bledsoe of possession of cocaine as charged in count III. The jury found appellant Barber guilty of counts I and II but not guilty of count III. The lower court suspended imposition of appellants' sentences and placed each appellant on three years probation. Barber was ordered to serve 180 days in custody with credit for 2 days served as a condition of probation.

Each appellant filed a timely notice of appeal.

This court consolidated the two cases for purposes of appeal on June 16, 1986.

### FACTS

On August 15, 1985, Sergeant Santos and three other Tulare County Sheriff's Department undercover narcotics officers were conducting an undercover surveillance at a Motel 6 in Porterville, California, when appellant Barber arrived with a friend named Sam Makinson. Barber and Makinson were observed carrying police equipment and beer into a motel room. Appellant Barber was also observed loading a .38 caliber revolver. Makinson advised Santos that Barber was a policeman with the Visalia Police

Department. Sergeant Santos asked Barber for a beer. Barber responded he did not have any beer but that he could "do some lines" meaning provide cocaine. Barber indicated they were going to have a party and invited Santos to come and obtain some cocaine. Sergeant Santos asked Barber if he could get a gram of cocaine and Barber said he would be able to get it in 30 minutes. Barber and Makinson then left. The transaction was never consummated, however, since the officers continued with their original surveillance and left the area.

On August 20, 1985, Sergeant Santos and three other undercover narcotics officers were at a Taco Bell restaurant in Porterville eating their dinners outside on the patio when they observed Barber walk up to the order window. They recognized him as the person who had offered to furnish Sergeant Santos cocaine at the Motel 6 on August 15. Sergeant Santos gestured indicating a desire to speak to Barber. When Barber approached Sergeant Santos, Santos indicated to Barber he wanted to buy a gram of cocaine. Barber replied it would cost $100 and Santos should meet him at the car wash on Olive Street in 20 minutes.

Barber received his order of food and left the Taco Bell parking lot in a white pickup truck accompanied by Rebecca Bledsoe.

Approximately one-half hour later, Barber arrived at the designated car wash driving the same white pickup truck. Bledsoe was still a passenger in the truck. Sergeant Santos approached the pickup truck from the passenger side. Barber instructed Sergeant Santos to follow him to Long John Silver's fast food restaurant where he could purchase the cocaine. The two vehicles proceeded to the restaurant where they parked next to each other. Sergeant Santos exited his vehicle and approached the pickup truck on the driver's side. He gave $100 to Barber. Barber then took four bindles, later determined to contain .9 grams of cocaine, from Bledsoe's purse and handed the bindles to Sergeant Santos.

Sergeant Santos asked Barber if the cocaine was "good stuff." Barber responded affirmatively saying it was "good coke" and was "better than 96 percent."

Sergeant Santos testified Rebecca Bledsoe observed the entire transaction, was in a position to overhear the entire transaction and, as Barber drove away in the pickup truck, she told Sergeant Santos to "have fun."

Appellants were subsequently stopped and arrested. Bledsoe's purse was searched at the Porterville sheriff's substation and another bindle containing a quarter gram of cocaine was found in her wallet. The $100 of marked

bills given to Barber by Sergeant Santos was found in the ashtray of the truck.

Barber waived his *Miranda*[1] rights and admitted to Sergeant Santos the selling of the four bindles of cocaine but denied Bledsoe was involved in the transaction. He claimed no knowledge of her possession of cocaine. Barber also admitted he was not a police officer but admitted to passing himself off as a Visalia police officer.

### Defense

Appellant Barber presented a defense of entrapment.

Seventeen-year-old Steve Rauschul testified he had known Barber for three years. He saw Barber ordering food at the Taco Bell on August 20. He heard Santos call Barber over to his table by whistling at him. Barber approached and Rauschul overheard one of them asking Barber to sell them some "dope." Barber initially refused but the men were insistent. Barber ultimately acquiesced and told them to follow him to the car wash. Rauschul did not hear anyone mention a price. Rauschul also stated Bledsoe was with Barber at the time. He described the men as tough looking and "scummy."

Barber testified he first met Santos and the other undercover officers on August 15, 1985, at a Motel 6 in Porterville when he and a friend, Sam Makinson, rented a room for a local party. The men, who were not in uniform, approached him as he and Makinson were entering their motel room. He was asked by the undercover officers if there was going to be a party and if "coke whores" would be there. The officers asked him if he knew where they could buy some cocaine. He stated he did not and then left with Makinson.

Barber testified that when he arrived at the Taco Bell on August 20 with Rebecca Bledsoe, he heard Santos call him over as he placed his food order. He eventually recognized Santos from the incident at the Motel 6. Santos asked him about buying cocaine but Barber declined saying he did not sell cocaine. Santos then asked him if he knew how he could "score" as he wanted to party that night. Barber said he spotted an individual driving by whom he knew sold cocaine. Under pressure from Santos, Barber admitted he could obtain some cocaine from that individual. Santos suggested the

---

[1] *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974].

price of $100 and Barber said he thought that would be enough. Barber then told Santos to meet him at the car wash.

On his way to the car wash, Barber obtained the four bindles from the person he had seen. He was unaware of a fifth bindle. A fifth bindle was not a part of his transaction with his supplier. Barber testified Rebecca Bledsoe was unaware of the conversation with Santos or anyone else.

Barber admitted retrieving the cocaine bindles from the pickup truck at Long John Silver's restaurant but denied getting them from Rebecca Bledsoe's purse. He obtained them from the seat of the car. He put the money he received from Santos in the ashtray and planned to give it to his supplier. He denied telling Santos the cocaine was 96 percent pure although he admitted saying it was "good" cocaine.

He testified Santos intimidated him and that Santos and his companions looked like "bikers." He claimed he would not have sold the cocaine unless encouraged to do so by someone else.

Barber also testified that he had enrolled in the police academy at the College of the Sequoias in Visalia and had purchased police gear and a gun on August 13. Barber never attended the academy due to an accident in which he suffered a broken shoulder. He also testified Santos enlisted him as an informant.

Appellant Bledsoe offered no evidence in her defense.

### Rebuttal

On rebuttal, Santos denied coercing appellant to sell him the cocaine. He reiterated that Barber reached into Bledsoe's purse to obtain the cocaine. Santos denied trying to recruit Barber as an informant.

### DISCUSSION

### I. WHETHER IT WAS ERROR TO DENY APPELLANTS' WHEELER MOTION

On February 11, 1986, appellant Bledsoe's trial counsel objected to the prosecutor's use of peremptory challenges to excuse four Spanish-surnamed members from the panel. Barber's trial counsel joined in the objection. Bledsoe's counsel then moved for a mistrial based on *People* v. *Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748]. The motion was

denied. On appeal, both Bledsoe and Barber contend the trial court erred in denying the *Wheeler* motion.

■ In *People* v. *Wheeler, supra,* the California Supreme Court concluded that "the use of peremptory challenges to remove prospective jurors on the sole ground of group bias violates the right to trial by jury drawn from a representative cross-section of the community under article I, section 16, of the California Constitution." (*Id.* at pp. 276-277.)

The United States Supreme Court has also condemned such abuse of the peremptory challenge as a violation of the right to equal protection of the laws under the Fourteenth Amendment to the federal Constitution. (*Batson* v. *Kentucky* (1986) 476 U.S. 79, 89 [90 L.Ed.2d 69, 82-93, 106 S.Ct. 1712].)

■ The *Wheeler* court formulated a three-part test by which a defendant could challenge the prosecutor's misuse of peremptory challenges to strike jurors on the basis of group bias alone. To make out a prima facie case of discriminatory exclusion, the defendant must establish as complete a record of the circumstances as is feasible, that the persons excluded are members of a cognizable group, and a strong likelihood that such persons are being challenged because of their group association rather than because of any specific bias. (*People* v. *Wheeler, supra,* 22 Cal.3d at p. 280.)

■ A showing that jurors are being excluded on the basis of a Spanish surname alone constitutes a prima facie case of exclusion of a cognizable class. (*People* v. *Trevino* (1985) 39 Cal.3d 667, 686 [217 Cal.Rptr. 652, 704 P.2d 719].)

■ In *Peters* v. *Kiff* (1972) 407 U.S. 493 [33 L.Ed.2d 83, 92 S.Ct. 2163] , the high court reversed on equal protection grounds a state conviction of a White defendant upon a showing that Blacks had been arbitrarily excluded from grand and petit jury service. The court rejected the state's contention that because the defendant was not himself Black he was not harmed by the exclusion. "[T]he exclusion from jury service of a substantial and identifiable class of citizens has a potential impact that is too subtle and too pervasive to admit of confinement to particular issues or particular cases." (*Id.* at p. 503 [33 L.Ed.2d at p. 94].) Thus, it is not necessary that the defendant be a member of a minority group in order to raise a *Wheeler* objection.

■ This court recently held the sequential process of each stage set forth in *Wheeler* requires that at the time the objection is made, the burden is upon the objecting party and justifications by the other side are not yet appropriate. "If justifications are heard at this early stage in the process an

undoubtedly unintended implication arises that a prima facie showing has been made to the satisfaction of the court." (*People* v. *Granillo* (1987) 197 Cal.App.3d 110, 122 [242 Cal.Rptr. 639].) The court continued: "Although the court may have second thoughts concerning whether a prima facie showing has been made, it may not return to the screening process. The sole issue then pending is the adequacy of the justifications." (*Ibid.*)

Once the defendant satisfies these requirements to the court's satisfaction, the burden shifts to the prosecutor to show that the jurors in question were legitimately excused. (*People* v. *Trevino, supra,* 39 Cal.3d 667, 683.)

In *People* v. *Johnson* (1978) 22 Cal.3d 296, a companion case to *Wheeler,* the California Supreme Court impliedly accepted as true the prosecutor's explanation offered to rebut the presumption of group bias but held it insufficient as a matter of law because it amounted to "decision-making by racial stereotype." (*Id.* at p. 299.)

■ In *People* v. *Hall* (1983) 35 Cal.3d 161 [197 Cal.Rptr. 71, 672 P.2d 854], the prosecutor offered an explanation purportedly based on the backgrounds of the particular jurors he had challenged. The court stressed that in such cases the trial court must "satisfy itself that the explanation is genuine. This demands of the trial judge a sincere and reasoned attempt to evaluate the prosecutor's explanation in light of the circumstances of the case as then known, his knowledge of trial techniques, and his observations of the manner in which the prosecutor has examined members of the venire and has exercised challenges for cause or peremptorily, for 'we rely on the good judgment of the trial courts to distinguish bona fide reasons for such peremptories from sham excuses belatedly contrived to avoid admitting acts of group discrimination.'" (*Id.* at pp. 167-168, quoting from *People* v. *Wheeler, supra,* 22 Cal.3d at p. 282.)

In *Hall,* the high court held the trial court had not seriously attempted to evaluate the prosecutor's proffered explanation and pointed to particular instances in which the prosecutor challenged Black jurors assertedly because of certain factors in their background but did not challenge White jurors having similar factors. (*People* v. *Hall, supra,* at pp. 168-169.)

In *People* v. *Trevino, supra,* 39 Cal.3d 667, the high court again emphasized the disparate treatment of the challenged and unchallenged groups on similar facts (*id.* at pp. 691-692) and concluded the majority of the challenged jurors "were excluded for reasons other than those presented to the court." (*Id.* at p. 692.)

In *People* v. *Turner* (1986) 42 Cal.3d 711 [230 Cal.Rptr. 656, 726 P.2d 102], a similar analysis was applied to the challenges to three Black jurors.

The court held the prosecutor's alleged reasons for exercising these peremptory challenges (one Black was supposedly excused for being a truck driver, another for being a hospital supervisor and the third for being a mother) were clearly pretexts for illegal discriminatory jury selection, and that such error was prejudicial per se. (*Id.* at pp. 722-727.)

██ In the instant case, appellant's trial counsel objected to the prosecutor's use of four of six peremptory challenges to excuse Spanish-surnamed potential jurors. The four excused jurors were Cynthia, Robert, George and David.[2] Once the objection was made, the trial court invited the prosecutor to explain her reasons for excusing the particular jurors. Ms. Paden, the prosecutor, responded: "In regards to Mr. Staven's Wheeler motion made yesterday concerning my removal of four jurors from the panel, in particular those persons being a Cynthia . . . , Robert . . . , George . . . and David . . . , at this time I would like to explain my reasons and rationale for exercising a peremptory challenge in removing them from the jury.

"As to the first, Cynthia . . . , I must point out that I did not recognize that name as a Spanish surname. This juror appeared to be a white nonMexican [*sic*] juror to myself. In my opinion I still am not convinced that that is necessarily a Spanish surname.

"Anyway, [Cynthia] indicated that her profession was that of a teacher, and it's been my experience as a prosecuting attorney that many teachers have somewhat of a liberal background and are less prosecution oriented.

"Furthermore, [Cynthia], upon questioning by myself indicated that she had a first cousin that was arrested last March for armed robbery or narcotics, and that it was pending trial as far as she knew, that he had just gotten out of Soledad and had been in Soledad for several years.

"I didn't feel that her response, to wit, that that wouldn't affect her ability to be fair, was entirely sincere, and in my opinion having that close of a relative would affect her ability to be fair in this particular case.

"All right. Then next as to juror Robert . . . , Robert . . . appeared in the courtroom wearing a Coors jacket. He listed his occupation as an assembly plant worker. He also stated that his wife worked for an attorney, Attorney Victor Moreno.

"THE COURT: Moheno.

---

[2] The first names of the jurors are used to protect their anonymity.

"MS. PADEN: Moheno, which in my experience, even though I recognize he is a civil lawyer in my opinion and in my experience he is somewhat of a liberal attorney.

"As to Robert . . . , I felt it's important to note that I was thinking of the complex legal issues involved in this case, to wit, the law of aiding and abetting and the law of entrapment, and in analyzing whether or not the particular jurors, all of them, would be the type of persons that would be able to understand those somewhat complex legal principles.

"[Robert] did not appear to gain a complete grasp of the questions that the Court and counsel were propounding to him. He shook his head several times. He seemed shy, somewhat withdrawn.

"That combined with his occupation, his manner of dress, led me to believe that he may not be the type of person that could understand the type of principles that are involved in this case.

"Furthermore, [Robert] also stated that his brother had been accused of a theft within the past year and a half and that his brother had pled guilty to that theft.

"He said that he had not discussed that case with his brother and that he could be fair, however, once again, I did feel from his response that that wasn't an entirely sincere answer. And given the complex nature of the case and this close relative having been involved on the adverse side of the system, I felt that I was justified in exercising a peremptory on him.

"As to the next juror, George . . . , this juror was also an 'unprofessional,' quote unquote, person, a tractor driver, his wife a housewife. He seemed unfamiliar with the legal principles that were being propounded to him.

"Once again, the fact that we were dealing with complex legal issues entered into my mind and I did not feel that he was completely understanding those or would be able to.

"This is also the juror who said that it would cause a financial hardship upon him if he was not allowed to go back to work. He stated that he was pretty close to spraying the trees, that he was needed on the farm and there was only two persons, him and another person who were involved in that, and that it would cause a financial hardship.

"The Court interposed at that point that he would be paid, and another juror I heard respond, 'No, farmers do not pay for jury duty.' That financial

situation plus my feelings of his inability to understand the complex issues motivated me in removing him as a potential juror.

"As to the fourth person, David . . . , David . . . was the person who stated he was unemployed and his wife worked at the packing house.

"He did not appear to have an understanding of the legal principles that had been propounded to him from the Court and counsel, particularly when Mr. Staven was questioning him about his client, Miss Bledsoe, and whether or not she would have to testify. He seemed confused about that despite the fact that had been gone over previously in the courtroom.

"I asked [David] if he had been employed previously to his unemployment status. He said, 'Yes, at a tire company.' I said, 'Was that in Tulare County?' And he said, 'No, it was in Porterville and Lindsay.' He indicated that he had only worked there 15 months.

"That indicated to me that this person was also possibly unable to understand the complex legal issues involved, possibly unstable individual.

"[David] further stated that he had an uncle that was involved in drugs and other things, including fighting. He stated that he didn't have any idea whether his uncle was treated fairly and he didn't know alot [sic] about the laws of drugs.

"And he said that, quote, 'He has taken alot [sic] of that away from myself, mostly because I serve God and I don't worry much about things like that anymore.' I felt that to mean that this person had possibly previously been involved in drugs himself or that his religious feelings were such that could hamper his ability to deal with the particular case at hand, and that he would have a problem understanding and dealing with the laws as they relate to narcotics.

"I would submit to the Court that counsel has shown no prima facie case of exclusion of any racial group by the prosecuting attorney. As the Court well knows we have two white defendants on trial here.

"The defense had made very clear that the defense as to at least one of the defendants is entrapment. We have our main detective, narcotics detective, Sergio Santos, who is a Mexican, and certainly the People are not purposefully trying to exclude Mexicans from the jury from that standpoint alone.

"It should be also noted, and the record will reflect this, that at the present there are two Mexican persons still remaining on the jury." The

trial court subsequently stated: "With the name [Cynthia's last name] you can either come up with Portuguese or Mexican. I will tell you that is the first person that I have known or heard of that had the name [Cynthia's last name], and I think I'm familiar with Hispanic names being half-Mexican myself. So that lady could have been anything.

"As far as I'm concerned, as far as this particular juror is concerned, I think that counsel is completely justified and that she is completely sincere in what she says, that she didn't recognize her as being Hispanic.

". . . . . . . . . . . . . . . . . . . . .

"And the motion for mistrial is going to be denied.

"I do not feel that proceeding at this time will deprive either of these defendants of a fair trial. I do not feel that the fact that these jurors who were excused happen to be Hispanics was the sole reason that they were being challenged.

"The District Attorney in my opinion explained tomy [*sic*] satisfaction good and sufficient reasons for challenging these people."

■ This court, in *People* v. *Granillo, supra,* 197 Cal.App.3d 110, determined that if a single peremptory excuse is not justified, the presumption of validity is rebutted. (*Id.* at p. 123.) And the Supreme Court stated in *Wheeler* that "[i]f the court finds that the burden of justification is not sustained as to *any* of the questioned peremptory challenges, the presumption of their validity is rebutted." (*People* v. *Wheeler, supra,* 22 Cal.3d at p. 282.) Thus, the expressed justification for challenging each of the four Spanish-sur-named jurors must be examined separately. ■ According to *Wheeler,* there need be some specific bias on the part of the potential juror to rebut the prima facie showing of group bias. (*Id.* at pp. 273-275.)

■ "To say that peremptories will ordinarily be exercised only in cases of bias, however, does not clarify the kinds of bias upon which the challenge may permissibly be based. In contrast to the limited list of events authorizing a challenge for cause on the ground of implied bias (Pen. Code, § 1074), the law recognizes that a peremptory challenge may be predicated on a broad spectrum of evidence suggestive of juror partiality. The evidence may range from the obviously serious to the apparently trivial, from the virtually certain to the highly speculative." (*Id.* at p. 275.)

■ The prosecutor may justify the challenge based on a specific bias as the Supreme Court has defined that term—"a bias relating to the particular case on trial or the parties or witnesses thereto." (*Id.* at p. 276.)

We must review the record to see if it demonstrates that the prosecutor satisfied her burden of showing that she excluded the Spanish-surnamed jurors on the grounds of specific, not group, bias. ■■ In doing so, it may be noted: "Jury selection is, in itself, an inexact science, based as often on hunches and inferences about human behavior as on hard facts. By their very nature, peremptory challenges particularly lend themselves to the application of popular psychology, the consideration of unarticulated values, and the varied experiences—both at trial and in life—of the attorneys who use them. As a result, a decision to exercise a peremptory challenge may be based on factors that an appellate court cannot see when reviewing a cold record." (*People v. King* (1987) 195 Cal.App.3d 923, 932 [241 Cal.Rptr. 189].)

## Cynthia

■■ We first note Cynthia is married, "I'm a kindergarten teacher . . . and my husband works for Royal Insurance." Thus, it may very well be that this prospective juror's last name is her married name and not her maiden name. When the court invited the prosecutor to explain her reasons for excusing the particular jurors, inferring appellants had made a prima facie showing of a presumption of group bias, Ms. Paden responded: "As to the first, Cynthia . . . , I must point out that I did not recognize that name as a Spanish surname. This juror appeared to be a white nonMexican [*sic*] juror to myself. In my opinion I still am not convinced that that is necessarily a Spanish surname." The trial court stated: "With the name [Cynthia's last name] you can either come up with Portuguese or Mexican. I will tell you that is the first person that I have known or heard of that had the name [Cynthia's last name], and I think I'm familiar with Hispanic names being half-Mexican myself. So that lady could have been anything."

The trial court found the prosecutor to be "completely justified" and "completely sincere" in her statement that she did not recognize Cynthia as being Hispanic. ■■ While "we rely on the good judgment of the trial courts to distinguish bona fide reasons for such peremptories from sham excuses belatedly contrived to avoid admitting acts of group discrimination" (*People v. Wheeler, supra,* 22 Cal.3d 258, 282), the trial court is not to consider the proffered justifications in terms of the prosecutor's " 'judgment' or 'sincerity,' " but must determine whether the "ground of challenge was a specific bias on the part of the individual juror." (*Id.* at p. 284, fn. 32.)[3]
■■ Nevertheless, we agree with the trial court's conclusion that the

---

[3] "[E]ven when there is no doubt of the prosecutor's good faith, the issue whether a given explanation constitutes a constitutionally permissible—i.e., nondiscriminatory—justification for the particular peremptory challenge remains a question of law." (*People v. Turner, supra,* 42 Cal.3d 711, 720, fn. 6.)

district attorney had given good and sufficient reasons to rebut the presumption of group bias as to Cynthia. There is no adequate showing here that Cynthia falls within the cognizable class, i.e., Spanish-surnamed persons. More importantly, neither the prosecutor nor the trial judge recognized Cynthia as coming within the cognizable class, even assuming arguendo she did. In our view, a bona fide showing by the prosecutor, reasonably accepted by the trial court, that he or she did not believe or recognize a prospective juror as being a member of a particular cognizable class, i.e., Black, Hispanic, Oriental, etc., effectively resolves the issue in favor of the prosecution.

Moreover, the prosecutor articulated other, additional reasons for exercising a peremptory challenge as to Cynthia: Cynthia's profession is that of a kindergarten teacher. Furthermore, she had a first cousin who had been arrested and was then awaiting trial for either armed robbery or narcotics violations. The cousin had recently been released from Soledad after being imprisoned there for several years.

The prosecutor indicated that in her experience as a prosecuting attorney "many teachers have somewhat of a liberal background and are less prosecution oriented." Peremptory challenges are often exercised against teachers by prosecutors on the belief they are deemed to be rather liberal.

Unlike the unsatisfactory vague explanation given by the prosecutor in *Turner, supra,* 42 Cal.3d 711, " 'something in [the juror's] work' " as a supervising hospital unit coordinator would " 'not be good for the People's case' " (*id.* at p. 725), Ms. Paden relied on her past experience that teachers tend to be "liberal" and "less prosecution oriented." █ Furthermore, said rationale is coupled with the well-recognized concern that a personal experience such as the conviction of a crime by a close relative can give rise to a significant potential for bias against the prosecution. (*People* v. *Wheeler, supra,* 22 Cal.3d at p. 277, fn. 18.) The prosecutor indicated she was not convinced by Cynthia's response that she would be unaffected in her assessment of this case by her cousin's experiences.

It should be noted that in *People* v. *Granillo, supra,* this court stated: "We recognize peremptory challenges are often based on counsel's experience or hunch that some people are unsatisfactory as jurors. Many prosecutors believe various professional people are unacceptable because they may be too demanding or they look for certainty. Likewise, prospective jurors with unpleasant legal enforcement experience or contacts are often excused despite their assurances that they are unaffected by their treatment. When reasons of this kind are given, in a *Wheeler* hearing, for excusing jurors who also share a protected-class background, different questions about the

prosecutor's motives arise." (*People* v. *Granillo, supra,* 197 Cal.App.3d 110, 120-121, fn. 2.)

The above-cited dicta in the *Granillo* footnote provides no further explanation of the phrase "different questions about the prosecutor's motives arise." However, *Wheeler* is instructive in this regard. There, our Supreme Court stated: "To say that peremptories will ordinarily be exercised only in cases of bias, however, does not clarify the kinds of bias upon which the challenge may permissibly be based. In contrast to the limited list of events authorizing a challenge for cause on the ground of implied bias (Pen. Code, § 1074), the law recognizes that a peremptory challenge may be predicated on a broad spectrum of evidence suggestive of juror partiality. The evidence may range from the obviously serious to the apparently trivial, from the virtually certain to the highly speculative.

"For example, a prosecutor may fear bias on the part of one juror because he has a record of prior arrests or has complained of police harassment, and on the part of another simply because his clothes or hair length suggest an unconventional lifestyle. In turn, a defendant may suspect prejudice on the part of one juror because he has been the victim of crime or has relatives in law enforcement, and on the part of another merely because his answers on voir dire evince an excessive respect for authority. Indeed, even less tangible evidence of potential bias may bring forth a peremptory challenge: either party may feel a mistrust of a juror's objectivity on no more than the 'sudden impressions and unaccountable prejudices we are apt to conceive upon the bare looks and gestures of another' (4 Blackstone, Commentaries *353)—upon entering the box the juror may have smiled at the defendant, for instance, or glared at him. Responsive to this reality, the law allows removal of a biased juror by a challenge for which no reason 'need be given,' i.e., publicly stated: in many instances the party either cannot establish his reason by normal methods of proof or cannot do so without causing embarrassment to the challenged venireman and resentment among the remaining jurors.

"All of these reasons, nevertheless, share a common element: they seek to eliminate a specific bias as we have defined that term herein—a bias relating to the particular case on trial or the parties or witnesses thereto. By the same token, they are essentially neutral with respect to the various groups represented on the venire: the characteristics on which they focus cut across many segments of our society. Thus both blacks and whites may have prior arrests, both rich and poor may have been crime victims, both young and old may have relatives on the police force, both men and women may believe strongly in law and order, and members of any group whatever may alienate a party by 'bare looks and gestures.' It follows that peremptory

challenges predicated on such reasons do not significantly skew the population mix of the venire in one direction or another; rather, they promote the impartiality of the jury without destroying its representativeness." (*People* v. *Wheeler, supra,* 22 Cal.3d 258, 275-276, fn. omitted.) Thus, in this respect, *Granillo* merely reaffirms the requirement in a *Wheeler* hearing that the articulated reasons for peremptorily excusing a prospective juror who also shares a protected-class background must seek to eliminate a specific bias, as defined in *Wheeler*—a bias relating to the particular case on trial or the parties or witnesses thereto and which by the same token are essentially neutral with respect to the various groups represented on the venire. In other words, counsel must articulate bona fide reasons for the exercise of the peremptory challenge that would be equally applicable to any member of the venire, irrespective of whether or not that person was a member of an identifiable class, as opposed to mere sham excuses belatedly contrived to avoid admitting acts of group discrimination.

As to Cynthia, not only does the record show the prosecutor was reasonably unaware of Cynthia's ethnic background but that there were other viable reasons given for the prosecutor to be concerned regarding a significant potential for bias against the prosecution by the prospective juror. Clearly, the record supports the trial court's conclusion that the use of a peremptory challenge to remove Cynthia was not on the sole ground of group bias and therefore did not violate the right to trial by jury drawn from a representative cross-section of the community under article I, section 16, of the California Constitution.

### Robert

As to Robert, it has been stated that "a prosecutor may fear bias on the part of one juror . . . simply because his clothes or hair length suggest an unconventional lifestyle." (*People* v. *Wheeler, supra,* 22 Cal.3d at p. 275.) The prosecutor noted Robert wore a "Coors jacket." The wearing of such a jacket to court might have suggested to the prosecutor a lack of respect for the dignity of the court or the court system or, on the other hand, perhaps a general lifestyle or attitude. But more importantly, in addition to the aforementioned jacket, Robert's brother had pleaded guilty to theft within the past year and a half. And as stated earlier, this personal experience could give rise to a significant potential for bias against the prosecution. (*Id.* at p. 277, fn. 18.)

The prosecutor also noted she perceived Robert as being shy and withdrawn. *Wheeler* acknowledges that a peremptory challenge may be based on " 'sudden impressions and unaccountable prejudices we are apt to conceive upon the bare looks and gestures of another' (4

Blackstone, Commentaries *353) . . . ." (*People* v. *Wheeler, supra,* 22 Cal.3d at p. 275.) While a juror's shy and withdrawn demeanor may not be sufficient reason, in and of itself, to meet the prosecutor's burden to prove that the peremptory challenge was not exercised against a protected-class juror in violation of the defendant's right to trial by a jury drawn from a representative cross-section of the community, it need not be ignored or rejected when considered with the other, additional and valid reasons given. We do note there is nothing in the record to support the prosecutor's contention Robert failed to grasp the questions propounded to him by court and counsel. It is, of course, a "cold" record. (See *People* v. *King, supra,* 195 Cal.App.3d 923, 932.) It does not reveal that Robert shook his head or failed to understand the questions. So, the record does not support the prosecutor in this regard. However, the trial court could reasonably conclude that Robert's experiences in connection with his brother's conviction for theft, his appearance and demeanor in court, which the trial court was in a position to observe, constituted sufficient reasons for exercising a peremptory challenge against Robert and provided a valid basis for the trial court's determination Robert was not excused on the sole ground of group bias.

### George

 The prosecutor indicated she excused George because he was an "unprofessional," seemed unfamiliar with the legal principles propounded to him and that his serving as a juror would cause a financial hardship upon him.

George, a tractor driver married to a housewife, was engaged in the following exchange on voir dire:

"MR. HEUSDENS [defense counsel for appellant Barber]: So you feel that you have no problems at all sitting here and judging this case, you have no preconceived notions right now whether my client is guilty or innocent?

"A JUROR [George]: No.

"MR. HEUSDENS: So right now if you had to vote you would vote him not guilty?

"A JUROR: Right now?

"MR. HEUSDENS: Right.

"A JUROR: I don't know.

"MR. HEUSDENS: You have no evidence.

"A JUROR: Right.

"MR. HEUSDENS: So you have no evidence to show anything, you would have to vote him not guilty; is that correct?

"THE COURT: What he's asking, [George], as I told you a defendant is presumed by law to be not guilty until you are convinced by the evidence—

"A JUROR: Yeah.

"THE COURT:— beyond a reasonable doubt that he is guilty. And right now there has been no evidence so he has to be not guilty.

"A JUROR: Okay.

"MR. HEUSDENS: The mere fact that he is sitting—or there are police officers in this courtroom, you would not use that as evidence at all of his guilt?

"A JUROR: No.

"MR. HEUSDENS: And you would not consider the fact that these police officers on the other side that are going to testify, just because they are police officers and are going to testify, you're not going to accept that as truth by itself, are you, until you weigh all the evidence; is that correct?

"A JUROR: Yes."

Thus, the record arguably supports the prosecutor's expressed concern regarding George's ability to comprehend legal principles. It appears he did not understand the principle of presumption of innocence although that concept had been explained by the trial court previously. This concern is coupled with George's claim of financial hardship were he required to serve as a juror. Thus, in our view, the record supports the trial court's conclusion that George was not excused on the basis of group bias alone.

### David

■ Although it had previously been explained to the jury panel by the trial court, David appeared to have difficulty with the concept that appellant Bledsoe need not testify at trial. That, combined with his statement quoted by the prosecutor and set out previously herein as one of her reasons

for excusing David, clearly supports her concern regarding his inability to understand the legal principles which would be involved in this case. In addition, he had an uncle involved in the criminal justice system for drugs and fighting. The record clearly supports the prosecutor's contention and the trial court's determination that David was not excused on the basis of group bias alone.

 Finally, we note there was no apparent disparate treatment of the four (or possibly only three) Hispanic prospective jurors excused by the prosecutor when compared to non-Hispanic members of the venire allowed to remain on the jury, a practice condemned in *People* v. *Hall, supra,* 35 Cal.3d 161 as "strongly suggestive of bias, and could in itself have warranted the conclusion that the prosecutor was exercising peremptory challenges for impermissible reasons." (*Id.* at p. 168.)

For the reasons stated above, we conclude no error occurred in the denial of the *Wheeler* motion and the motion for mistrial. The prosecutor rebutted every reasonable inference that any Spanish-surnamed juror was peremptorily challenged solely on the basis of group bias.

## II.*

. . . . . . . . . . . . . . . . . . .

The judgment is affirmed.

Woolpert, Acting P. J., and Best, J., concurred.

---

* See footnote, *ante,* page 378.