[No. A032236. First Dist., Div. Two. Feb. 9, 1987.]

THE PEOPLE, Plaintiff and Respondent, v.
NORRIS CHAMBIE, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to rules 976 and 976.1, California Rules of Court, this opinion is certified for publication with the exception of part II.

COUNSEL

Gary Brett Beeler, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, David D. Salmon and Cynthia Choy Ong, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

ROUSE, Acting P. J.—Defendant Norris Chambie appeals from a judgment of conviction based upon a jury verdict finding him guilty of forcible oral copulation, in violation of Penal Code section 288a, and forcible rape, in violation of Penal Code section 261, subdivision (2).

*The Facts*

LaSherell W. testified that on the afternoon of December 12, 1983, less than three weeks after her 15th birthday, defendant Norris Chambie, whom she knew slightly, stopped her on the street and told her that she "was going to suck his dick." He then dragged her into a deserted backyard, repeatedly hitting her in the face whenever she struggled or tried to talk to him. Once inside the backyard, defendant forced LaSherell to orally copulate him and he then raped her. During the course of this sexual assault, defendant continued to hit LaSherell in the face whenever she resisted or asked why he was treating her in this manner. He also struck her on the leg with a piece of wood and called her a bitch. Defendant finally released LaSherell after making her promise to tell no one what had happened.

LaSherell testified that shortly after defendant released her, she went to the home of a girlfriend, Martel H., and told her what had happened.

LaSherell then returned to her home, but did not feel able to tell her mother about the sexual assault. However, on the following morning, she told a visiting family friend what had happened. LaSherell's mother then called the police and arranged to have her taken to the hospital.

Dr. Patricia Robinson, a staff gynecologist at Kaiser Hospital in Oakland, testified that she performed a sexual assault evaluation on LaSherell on December 13, 1983. Dr. Robinson stated that she first asked LaSherell what had happened and LaSherell told her that she had been sexually assaulted by defendant. Dr. Robinson prepared a sexual assault kit, which included a vaginal swab taken from LaSherell.

Mary Gibbons, a criminologist with the Oakland Police Department, testified that she had examined the sexual assault kit pertaining to LaSherell. She found both semen and spermatazoa on LaSherell's vaginal swab.

Martel H. testified that approximately two weeks before Christmas in 1983, LaSherell came to her home unexpectedly one night. LaSherell immediately began crying and then told Martel that defendant had raped her.

Karlos E., the only witness for the defense, testified that defendant was his friend and that he and defendant were at the Oakland Boys Club when the sexual assault had allegedly occurred.

## I.

Defendant contends that the trial court erred in denying his motion for mistrial by ruling that the prosecutor had adequately rebutted defendant's *Wheeler* claim that the prosecutor had improperly used peremptory challenges to excuse certain prospective jurors solely on the basis of race.

In *People* v. *Wheeler* (1978) 22 Cal.3d 258, 280 [148 Cal.Rptr. 890, 583 P.2d 748], the California Supreme Court held that when a party believes that his opponent is using his peremptory challenges to strike jurors solely on the ground of group bias, he must raise the point in a timely manner and make a prima facie case that such discrimination is occurring. The *Wheeler* court further held that when the trial court finds that such a showing has been made, the burden then shifts to the other party to justify the use of his peremptory challenges and demonstrate that they were not predicated upon group bias alone. (*Id.,* at p. 281.)

In this case, the record shows that after the prosecution and the defense had conducted voir dire examinations of the first twenty-four prospective jurors, the prosecutor exercised seven peremptory challenges, removing four

White and three Black jurors. By so doing, the prosecutor removed three of the four Black prospective jurors who had thus far been subject to challenge.

The jurors who had been challenged and excused were replaced by other jurors, and during this process, two additional Black jurors, Charlena Iadeva and Mary Conyers, took their places in the jury box. During the next round of peremptory challenges, the prosecutor removed Ms. Iadeva from the jury.

Defense counsel then moved for a mistrial based upon the *Wheeler* case, pointing out to the trial court that the prosecutor had now used four peremptory challenges to remove Black jurors and that only two of the Black jurors who had been called remained in the jury box. The trial court directed the prosecutor to respond to the motion, and he then explained his reasons for removing the four Black jurors. The trial court ruled that it was denying the *Wheeler* motion because the prosecutor had made an adequate showing that his peremptory challenges to the four Black jurors had not been exercised on a racial basis.

The prosecutor then used his ninth peremptory challenge to remove Ms. Conyers, and defense counsel promptly renewed his *Wheeler* motion. The prosecutor explained to the court and defense counsel why he had decided to challenge Ms. Conyers, and the trial court again found the explanation satisfactory and denied defendant's *Wheeler* motion. The prosecutor exercised no further peremptory challenges, and one Black juror, Ms. Terrell, remained on the jury which tried and convicted defendant.

Defendant claims that, from a strictly numerical point of view, there was overwhelming evidence that the prosecutor was systematically excluding Blacks from the jury. He argues that where, as here, a prosecutor exercises peremptory challenges to remove five out of six Blacks in a thirty-four member pool of prospective jurors, it is inconceivable that the prosecutor could have been motivated by nonracial considerations. Defendant contends that, in such a situation, "the range of a trial court's discretion to deny a motion for mistrial should be quite small" and that, in this instance, the record furnishes no support for the trial court's determination that the prosecutor adequately justified his peremptory challenges to the five Black jurors on nonracial grounds. Defendant also asserts that, in addition to the numerical evidence that the prosecutor improperly used peremptory challenges to exclude Blacks from the jury, further support for such conclusion can be found in the heterogeneous quality of the five excluded Black jurors and in the fact that the prosecutor's stated nonracial grounds for challenging those jurors could, but did not, cause the prosecutor to challenge various White jurors.

In the recent case of *People* v. *Turner* (1986) 42 Cal.3d 711 [230 Cal.Rptr. 656], the California Supreme Court reaffirmed the basic principles espoused in *Wheeler* and set forth more detailed guidelines to be followed in determining what would constitute a prima facie showing of group discrimination and what would constitute an adequate rebuttal of such a showing. ▉ In this instance, we need look no further than the *Turner* court's holding that when defense counsel makes a *Wheeler* motion and the trial court then asks the prosecutor to explain the reasons for his peremptory challenges, such inquiry implies a prima facie showing of group discrimination and shifts the burden of justification to the prosecutor. (42 Cal.3d at p. 717.) That is what occurred in this case. Here, defense counsel established a prima facie case of group discrimination by pointing out that the prosecutor had initially used three out of seven peremptory challenges to eliminate three of the four Black jurors then subject to challenge and, when two other Black jurors became subject to challenge, the prosecutor promptly removed both of them, thereby having cumulatively eliminated five out of six prospective Black jurors.[1]

▉ In our review of the prosecutor's rebuttal to defendant's prima facie showing of group discrimination and the trial court's evaluation thereof, we are mindful of certain principles distilled from *Wheeler* and *Turner*: (1) the prosecutor need not make a showing that rises to the level of a challenge for cause, but must persuade the trial court that the peremptory challenges in issue were exercised on grounds that were reasonably relevant to the particular case being tried or to its parties and witnesses and pertained to specific bias (*People* v. *Turner, supra,* 42 Cal.3d 711, 720; *People* v. *Wheeler, supra,* 22 Cal.3d 258, 281-282); and (2) the trial court must make a sincere and reasoned attempt to evaluate the prosecutor's explanation and decide whether it is genuine, based upon the court's familiarity with the circumstances of the case, its knowledge of trial tactics and its observations of the manner in which the prosecutor has examined members of the jury venire and has exercised challenges for cause and peremptory challenges. (*People* v. *Turner, supra,* at p. 721; *People* v. *Wheeler, supra,* at p. 282.)

The prosecutor offered the following explanation for peremptorily challenging each of the five Black jurors:

(1) *Loretta Gattison*

The prosecutor stated that he had exercised a peremptory challenge to remove Mrs. Gattison from the jury because she had served on the jury in

---

[1]In *People* v. *Wheeler, supra,* 22 Cal.3d 258, 280, the court stated that as one means of making a prima facie case of group discrimination, a party might show that his opponent had struck "most or all" members of a cognizable group, such as Blacks, or had "used a disproportionate number of his peremptories" against that group.

the last case that he had tried and the jury had acquitted the defendant in that case even though the prosecutor felt that the evidence of guilt was very strong. The prosecutor stated that based on this prior experience with Mrs. Gattison, "I could not possibly keep her a second time and run a risk of a second not guilty." The prosecutor also pointed out that Mrs. Gattison had indicated during voir dire examination that she found the decision making required of a juror to be very difficult.

According to the record, during the voir dire examination Mrs. Gattison stated that she had previously served on a jury in an aggravated assault case. When asked how she felt about serving on another jury, Mrs. Gattison made the following statements: "[I]t's quite a bit of thinking ... to try to make the right decision .... [¶] [I]t's a lot of concentration .... [¶] ... [I]t takes really [*sic*] concentration because we're—we're really deciding on a person's ... innocence or guilt."

### (2) *Frank Bodden*

The prosecutor stated that he had challenged Mr. Bodden because he had indicated during voir dire examination that he was self-employed and extremely concerned about the financial hardship that jury duty would entail. The prosecutor explained that under such circumstances, he felt that Mr. Bodden would be so preoccupied with his financial problems that he would be unable to properly focus his attention on the case.

The record shows that, during his voir dire examination, Mr. Bodden stated that he was already in his third week of jury duty. He also stated that he was self-employed and added that "It's a hardship all right. I've lost money for the last two weeks [¶] .... So, if you [the prosecutor] want to pay my child support and make my house note I'll sit in here. ... Well, that's my situation right now, and I'm not trying to be difficult or a hard nose and run a hard case. I got a lot of things pending. It's just piling up, you know, and while I was on my lunch I had to go deal with the I.R.S."

### (3) *Annie Murphy*

The prosecutor stated that he had challenged Ms. Murphy because, when she was asked during voir dire whether she thought that a woman could lie about being raped, she had replied that she believed that there was a "great" possibility of that occurring. The prosecutor stated that it was his recollection that the other jurors had all conceded a possibility of the victim's lying, but not a "great" possibility. He explained that he had previously believed that Ms. Murphy would be a "fine" juror, but that the way in which she had answered this particular question "really scared me." For that reason he

concluded that Ms. Murphy might be unable to be completely fair to the victim because Ms. Murphy "accorded the possibility of her lying a greater emphasis than any of the other jurors . . . ."

During her voir dire examination, when asked how she felt about the possibility that a woman might lie about being raped, Ms. Murphy replied, "It's a great possibility, yes."

(4) *Charlena Iadeva*

The prosecutor stated that he had challenged Mrs. Iadeva because she had a son and a brother who had both been prosecuted for possession of narcotics and because Mrs. Iadeva had given him the impression during voir dire that her frustrations with the legal system might cause her to hold the prosecution to a higher standard of proof than that legally required.

The transcript of her voir dire examination shows that Mrs. Iadeva stated that she had a son and a brother who were prosecuted for possession of narcotics. She also stated, with reference to the incident involving her brother, that he had been beaten by the police and that she considered this unnecessary. When Mrs. Iadeva was later asked whether she had any problem with the fact that the prosecution was not required to prove its case "beyond all possible doubt," she replied that she found it "troublesome" because of the serious consequences of a criminal prosecution. When the prosecutor then asked Mrs. Iadeva whether she would hold him to a standard of proof higher than the law required, she replied, "I'm going to call it grammar laid down by the judge."

(5) *Mary Conyers*

The prosecutor stated that his peremptory challenge of Ms. Conyers was based, in part, upon the fact that she had a brother and a cousin who were involved in criminal activities. The prosecutor also stated that since Ms. Conyers was in law school, he felt that the other jurors might tend to defer to her and that it would became "a question of not convincing 12 people, but convincing one person." Finally, the prosecutor stated that Ms. Conyers had given him the impression that she was a defense-oriented individual who would generally tend to side with the accused rather than with the victim in a criminal prosecution.

The record of her voir dire examination reveals that Ms. Conyers stated that she had just finished her first year of law school. She had a brother who had been charged with armed robbery and a cousin who had been charged with car theft. Ms. Conyers stated that the prosecution against her brother

had motivated her to become a lawyer because it made her realize that people needed representation whether they were guilty or innocent and that individuals who were guilty of crimes might have committed them because of circumstances and not because they were "mean people."

In addition to the foregoing, the prosecutor also made a general statement to the effect that he did not consider the case to be one in which there was any possible motivation for excluding jurors because they were Black. He pointed out that the case involved a Black victim as well as a Black defendant and that the investigating officer, Sharon Jones, was also Black.

The trial court also made certain noteworthy remarks when ruling on defendant's *Wheeler* motion. With regard to the prosecutor's decision to challenge Juror Gattison because of her performance on a jury in a prior case, the judge stated that he had presided at the trial in question and that the jury had acquitted the defendant although "I felt that a typical jury would have brought in a guilty verdict." The trial judge also stated that Juror Bodden had approached him and asked if the attorneys might be willing to agree to excuse him because of financial hardship. The trial judge further stated that Mr. Bodden had made the same request in a prior case and had in fact been excused.

■ We are satisfied that this record substantiates the prosecutor's claim that his exercise of peremptory challenges was based upon nonracial grounds. ■ As previously pointed out, the exclusion of "most or all" of the members of a cognizable group through the use of peremptory challenges merely creates a prima facie case of group discrimination which the prosecution may then attempt to rebut. (*People* v. *Wheeler, supra,* 22 Cal.3d 258, 280.) Implicit in this rule is the fact that numbers alone are not controlling and that a prima facie case of group discrimination may successfully be rebutted even where the prosecutor has peremptorily challenged every single member of a particular cognizable group. Any other rule would be nonsensical, since it could easily operate in an unfair manner to inhibit a prosecutor who had already challenged what might be deemed a disproportionate number of jurors belonging to a particular cognizable group from challenging any other members of the same group, even if he had ample reason to believe that they were too biased to properly fulfill their duties as jurors.

■ Since we are convinced that defendant's reliance upon numbers alone does not support his claim of *Wheeler* error, we examine his remaining arguments. Essentially these consist of his assertion that if the excluded Black jurors were heterogeneous in nature, as compared with the rest of the community and the other jurors in the venire, and they were subjected to only a desultory voir dire examination and were challenged on weak grounds

which were equally applicable to White jurors who were not challenged, the prosecutor has not met his burden of rebutting the prima facie showing of group discrimination. (*People* v. *Wheeler, supra,* 22 Cal.3d 258, 280-282.)

We agree with defendant that the five Black jurors who were challenged by the prosecutor comprised a heterogeneous group of differing occupations and sexes. However, we find no merit to the claim that they were subjected to only a "desultory" voir dire examination. Similarly, we find no merit to defendant's claim that the five Black jurors were challenged on weak grounds or on grounds which were equally applicable to White jurors who were not challenged.

Defendant points out that, while the prosecutor's primary ground for challenging Juror Iadeva consisted of the fact that she had relatives who had been charged with crimes, he failed to challenge four White jurors who also had relatives who had been charged with crimes. However, the record reveals that three out of four of the White jurors in question, Piepenburg, Jowers and Thompson, were challenged by *defense counsel* at points in the proceedings when the prosecutor had not yet rested and was still exercising peremptory challenges. How, then, can it be said that the prosecutor would not have challenged these three jurors had defense counsel failed to do so? As for Juror Norsworthy, it is true that he stated during voir dire examination that he had a nephew who had been charged with possession of drugs and placed on probation. However, unlike Mrs. Iadeva, Mr. Norsworthy apparently was not disturbed by this incident, since he stated that he had "no feeling about it one way or the other." Juror Iadeva, by contrast, had two very close relatives, a son and a brother, who had been prosecuted on drug charges, and she also stated that her brother had been unjustifiably beaten by the police. She found it "troublesome" that the prosecution was only required to prove its case beyond a reasonable doubt, and when she was asked whether she could apply that standard of proof, she responded with the extremely ambiguous statement that she would "call it grammar laid down by the judge." We find no appreciable similarity between the attitudes evinced during voir dire by Jurors Iadeva and Norsworthy and conclude that the prosecutor's failure to challenge Juror Norsworthy casts no doubt upon the sincerity of his reasons for challenging Juror Iadeva.

Defendant also argues that the prosecutor demonstrated a lack of good faith in the exercise of his peremptory challenges when he challenged Juror Annie Murphy for stating that she thought that it was a "great" possibility that a woman might lie about being raped, but failed to challenge a White juror named James Burgess, who stated that he considered it "very" possible that a woman might lie about being raped. While, arguably, the words "great" and "very" have virtually the same meaning when used in this context, it

is probable that the demeanor of the two jurors and the emphasis with which they made these statements were very different. As previously noted, the prosecutor stated that he had earlier believed that Ms. Murphy would make a "fine" juror, but that the "way" in which she responded to the question concerning the possibility of an alleged rape victim lying "really scared me." In such a situation, the appropriate procedure is to defer to the trial court, which had the opportunity to observe the juror's demeanor and thereafter rule upon the adequacy of the prosecutor's response to defendant's *Wheeler* motion. As the court pointed out in *People* v. *Turner, supra,* 42 Cal.3d 711, 720, footnote 6, "To the extent that a trial court's ruling on the proffered explanation of a prosecutor turns on the latter's credibility, we agree with the United States Supreme Court that 'a reviewing court ordinarily should give those findings great deference.' (*Batson* v. *Kentucky* [(1986)] 476 U.S. 79, 98, fn. 21 [90 L.Ed.2d [69,] 89, 106 S.Ct. 1712].)" It is also worth noting that it was defense counsel who ultimately used a peremptory challenge to excuse Juror Burgess. If, as defendant now contends, Mr. Burgess appeared as doubtful of the credibility of rape victims as did Ms. Murphy, it is surprising that the defense would not want to retain him on the jury.

 In conclusion, we are satisfied that no *Wheeler* error occurred, and that the trial court fairly and correctly determined that the prosecutor had adequately rebutted defendant's prima facie showing of group discrimination during the jury selection proceedings by demonstrating a convincing nonracial reason for each exercise of a peremptory challenge against a prospective Black juror.

II.*

. . . . . . . . . . . . . . . . . . . .

Smith, J., and Benson, J., concurred.

---

*See footnote, *ante,* page 149.