Filed 11/17/14  P. v. Sanders CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>MARVIN SANDERS,<br><br>    Defendant and Appellant. | B249682<br><br>(Los Angeles County<br>Super. Ct. No. MA051056) |

APPEAL from a judgment of the Superior Court of Los Angeles County, John Murphy, Commissioner.  Affirmed.

Fay Arfa for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Paul M. Roadarmel, Jr., Supervising Deputy Attorney General, Connie H. Kan and John Yang, Deputy Attorneys General, for Plaintiff and Respondent.

# INTRODUCTION

A jury convicted defendant and appellant Marvin Sanders of attempted murder (Pen. Code, § 664/187, subd. (a)[1]) and assault with a semiautomatic firearm (§ 245, subd. (b)). The jury found true the allegations that the attempted murder was committed willfully, deliberately, and with premeditation (§ 664, subd. (a)), and that defendant personally used (§ 12022.53, subd. (b)) and personally discharged (§ 12022.53, subd. (c)) a firearm in the commission of the offense. As for the assault with a semiautomatic firearm offense, the jury found true the allegation that defendant personally used a firearm in the commission of the offense. (§ 12022.5, subds. (a) & (d).) The trial court sentenced defendant to life in prison with the possibility of parole plus a consecutive 20-year term.

On appeal, defendant contends the trial court erred in denying his *Wheeler*/*Batson*[2] motion, insufficient evidence supports his attempted murder conviction, insufficient evidence supports the jury's finding that he committed the attempted murder with premeditation, insufficient evidence supports his assault with a semiautomatic firearm conviction, the prosecution failed to disclose exculpatory evidence, defense counsel provided ineffective assistance of counsel by failing to investigate and present exculpatory evidence, evidence that he was a gang member improperly was introduced, the trial court erred in failing to give the jury a unanimity instruction, and the cumulative effect of the errors rendered his trial fundamentally unfair. We affirm.

---

[1] All statutory citations are to the Penal Code unless otherwise noted.

[2] *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*); *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*).

# BACKGROUND

## I. Prosecution's Case

### A. *Selina Guadiana's Testimony*

Selina Guadiana lived with her mother, Carrie Ortega, on Stanridge Avenue in Los Angeles County. On October 21, 2010, Guadiana's cousin, Jessica Shirley, visited the Guadiana home. That night, Guadiana and Shirley went to the grocery store. When they returned home, Guadiana noticed that there was a party near her house. There were about 50 people at the party. It was dark outside when they returned home.

Guadiana took the groceries inside the house. Shirley stayed outside and smoked a cigarette. After she put away the groceries, Guadiana went outside. Guadiana and Shirley walked to the front of the house. Guadiana looked in the direction of the party. She saw a crowd of people who appeared to be fighting. Guadiana and Shirley heard loud yelling and cussing. Guadiana turned around to return to her house and heard a gunshot from "that area." Guadiana looked back at the party and saw the crowd running away. She testified that she did not see who fired the shot. She saw a "Black guy just hand another Black guy" an object that she thought was a gun. The man with the gun ran up the street and got into a white car. Shirley called 911.

Guadiana testified that she spoke with Detectives Tony Delia and Daniel Farrell on October 25, 2010. The detectives showed her a six-pack photographic lineup and asked if she could identify the shooter or anyone "there." She did not identify anyone in the lineup. The next day, she went to the sheriff's department. She was shown a photographic lineup and was asked to identify "Pauly's older brother." After she selected one photograph, Detective Delia asked which photograph she would select if she had to select again. Guadiana then selected and circled a second photograph—photograph No. 6.[3] She told the detectives that the photograph she circled was a photograph of Pauly's brother. She did not say that the photograph was of the person she saw shoot the gun.

---

[3] Detective Farrell testified that defendant's photograph was photograph No. 6.

Guadiana did not see anyone in the courtroom that she knew as "Paco Sanders"[4] or "Marvin Sanders." She said that she knew that defendant was "Pauly's" brother or cousin. According to Guadiana, the Sanders family, including defendant, lived on Stanridge Avenue.

Guadiana met "Amanda"—apparently defendant's girlfriend Amanda Encinas—when Guadiana went to court in response to a subpoena. They spoke about the case. Guadiana told Encinas that she "made the identification" because the police wanted her to pick out "Paul's brother." She testified that she did not see defendant "at that location."

### B.     Jessica Shirley's Testimony

Shirley testified that as she stood in the front yard smoking a cigarette, she thought she saw a male holding a gun. Shirley entered Guadiana's house and spoke with Guadiana. Guadiana left the house to see what was happening and Shirley followed her. Shirley heard someone say, "This is bullshit." Shirley saw a male with an object in his hand that appeared to be a gun, but could have been anything. She then heard two gunshots or fireworks. After hearing the shots, Shirley saw two Black males jump inside a car and leave. Shirley called 911.

Shirley told the 911 operator that a Black man had a gun and was shooting it at people. The shooter had come out of a house and fired at people in the front yard. The shooter was "not that far" from the people at whom he was shooting. She said that the shooter got into a new, white Nissan car that did not have a license plate. The operator asked if she knew the shooter. Shirley responded, "I heard them say, 'Paco,' they kept calling 'Paco.'" She explained that when she told the operator that the shooter was "Paco," she was just repeating what others said.

On November 4, Shirley spoke with Detective Farrell. Shirley testified that she identified "Paco Sanders"—defendant's photograph—as the shooter from a six-pack

---

**4**     According to Detective Farrell, defendant's alias was "Paco."

photographic lineup. She claimed that Detective Farrell had "blackmailed" her into making a false identification by threatening to take her into custody on outstanding warrants. According to Shirley, once she made the false identification, the detective allowed her to remain out of custody. She did not report Detective Farrell to his superiors.

Shirley admitted that she was using methamphetamine around the time of the shooting. She did not remember if she used methamphetamine on the night of the shooting.

### C. Law Enforcement Testimony

Sheriff's Deputy Corey Reddy testified that he responded to Stanridge Avenue about 9:30 or 9:40 p.m. on October 21, 2010. There, Ortega told him that she heard glass break, people arguing, and two gunshots. Guadiana told Deputy Reddy that she saw a large number of people, including "Paco Sanders," arguing. According to Guadiana, Paco Sanders walked to a car—a white Nissan Cube—and pulled out a black handgun. As the crowd started to run away from him, he fired two rounds at the crowd.

Deputy Reddy testified that Shirley told him that she heard several people arguing after she and Guadiana had returned from the store and parked in the driveway. She said a male yelled at the crowd, "Fuck you, fuck it." The male then "pulled out a black handgun in front of a white Nissan Cube and fire two rounds at the crowd." The man got into the vehicle and sped away.

Deputy Reddy and others entered the house in front of which the crowd had argued to search for injured or dead persons. The house, which belonged to Rosa Leon, was empty. The deputy found a pack of cigarettes in the kitchen. A glass table in the kitchen was shattered, and a trail of blood led out the front door. Deputy Reddy followed the trail of blood out of the house. The trail first led to a nine-millimeter shell casing about 15 feet from the front door, then to a kitchen knife near the property's front gate— there was no blood on the knife, then to a second kitchen knife—also with no blood on it—just before the driveway to Guadiana's house, and finally to the walkway leading to

5

Guadiana's front door. Deputy Reddy called nearby hospitals and determined that no one had come in with a stab or gunshot wound.

Deputy Reddy requested that the knives, the nine-millimeter shell casing, and the cigarette pack be examined for fingerprints. A fingerprint on the cigarette pack belonged to 14-year-old Ruben Abelar. Abelar was a member of a gang. Deputy Reddy said that Ortega, Guadiana, and Shirley reported that there were 10 people in the crowd in front of the residence.

Detective Farrell testified that he conducted a follow-up interview with Guadiana four days after the shooting. Guadiana was "kind of reluctant," "tried to act as if she didn't remember anything," and did not want to talk with Detective Farrell. Detective Farrell showed Guadiana a six-pack photographic lineup. Guadiana quickly glanced at the lineup and "said she didn't know."

After Detective Farrell returned to the station, he reviewed the 911 call concerning the incident and concluded that Guadiana had withheld information from him. He returned to Guadiana's house and advised her that she was on active probation and that one of the conditions of her probation was that she was supposed to cooperate with law enforcement. Guadiana said that she understood, but did not want to talk at her house. She agreed to speak with Detective Farrell at the station.

At the station, Detective Farrell showed Guadiana a six-pack photographic lineup and asked if she could identify the shooter in the lineup. Guadiana identified defendant. Guadiana told Detective Farrell that she saw defendant walk out of a house and into the yard where he yelled, "Fuck you." Defendant raised a black handgun, pointed it at the crowd of people arguing on the sidewalk, and fired one shot. Guadiana said that after the people fled, defendant walked into the street and fired two more shots at the fleeing people. Defendant looked at Guadiana and said, "It's just a [BB] gun."

Detective Farrell showed Shirley a six-pack photographic lineup. He denied that he threatened her with arrest warrants when she did not select whom he wanted. Instead, he assured her that he was not there to arrest her for her warrants, and said that he was

6

there only to talk about the shooting and her 911 call. Shirley then identified defendant as the shooter from the photographic lineup.

Discussing the incident, Shirley told Detective Farrell that she smoked a cigarette in front of Guadiana's house after returning from the store. She watched a group of males arguing in front of a neighbor's house. She said defendant stood in the middle of the yard and watched the group of males. Another male came up behind defendant and handed him a handgun. Defendant held the gun next to his right thigh as if he was trying to conceal it. Defendant continued to listen and then yelled, "Fuck you, fuck it." Defendant fired one shot at the group. The group fled, and defendant walked into the street and fired a second shot at the group. Defendant got into a white car and left.

Detective Farrell spoke with Ortega. Detective Farrell showed Ortega a "six-pack" and asked her if she saw anyone in the six-pack in the neighborhood during the shooting. She pointed at defendant and said, "I saw him two hours prior that day."

On November 17, 2010, defendant was taken into custody. During an interview after his arrest, defendant told Detective Farrell that he was not present during the shooting. Describing his relationship with the people who lived on Stanridge Avenue, defendant said that he hated everyone who lived on that block. According to defendant, one of the families had a son who was trying to "run the block." That person may have driven past defendant's house when defendant lived on Stanridge Avenue and shot at defendant's mother's car while she was outside. Defendant said that when he sees people on that block, he "flips them off; he can't fuckin' stand them; they shot at my mom; they shot at me." Defendant claimed that "tweakers" were trying to set him up because they did not like him. A "tweaker" is someone who uses methamphetamine.

When defendant's mother visited defendant at the sheriff's station, she arrived in a white Nissan Versa that had "paper plates." Defective Farrell believed that the vehicle was "consistent with the vehicle that the witnesses described."

7

## II.    Defendant's Case

Encinas, defendant's girlfriend of seven years, testified that she and defendant had three children together. On October 21, 2010, she was at home with defendant. According to Encinas, she and defendant finished eating dinner together about 7:00 or 8:00 p.m. After dinner, Encinas prepared their children for bed while defendant played video games on the couch. She put the children to bed between 9:30 and 10:00 p.m. and fell asleep with them. Encinas could hear defendant playing video games as she put the children to bed. When she saw defendant the next day, he was sleeping on the couch. Two weeks prior to Encinas's testimony, Guadiana approached Encinas and said that she "never said it was Paco, and she just said it was Black guys, and she never seen him." Guadiana said that she "couldn't believe that it came this far, that she never said that it was him."

Teresa Magdelano, defendant's mother, testified that she was in Arizona visiting relatives on October 21, 2010. She had driven there in her white Nissan Versa. She left Arizona about 8:00 p.m. on October 21, 2010, and arrived in California about 6:00 a.m. on October 22, 2010. Magdelano never let defendant drive her car, and defendant did not have access to Magdelano's car on October 21, 2010.

## DISCUSSION

## I.    Defendant's *Wheeler/Batson* Motion

Defendant contends that the trial court erred when it denied his *Wheeler/Batson* motion. He argues that the prosecutor failed to give legitimate, race neutral reasons for excluding prospective juror No. 15 (juror No. 0353), who was Black, during the selection of the alternate jurors.[5] The trial court did not err.

---

**5**    During the course of the trial, the trial court excused two jurors and seated both alternate jurors.

8

In her voir dire responses, prospective juror No. 15 stated that she lived in Lancaster, was married to a barber, formerly was a dental office manager, and had an adult daughter who was a night auditor for Marriott. She had no prior jury experience. Her cousin was a Los Angeles Police Department detective. Another cousin had been a correctional officer in a Connecticut prison. That cousin was murdered by persons whom he had assisted in smuggling drugs into the prison. She did not own a gun and did not approve of civilians owning guns, but would decide the case based on the evidence.

Fifteen or 16 years earlier, prospective juror No. 15's husband was attacked and seriously injured outside of a convenience store. About 17 years earlier, her 19-year-old son was convicted of auto theft and sentenced to prison. She believed that her son "had a fair shake" and appreciated that the detective handling the matter had kept her informed of changes in the charges against her son. She was "somewhat pleased with the police, the District Attorney's Office, because they were able to obtain some information from [her] son which ultimately took him down a path where he wasn't going to be involved in crime anymore." Her son's criminal case would not bear on this case.

In her voir dire responses, prospective juror No. 17 stated, in relevant part, that when her daughter's apartment had been burglarized four years earlier, she and her daughter were not treated well by the responding deputy sheriffs. She believed that they had been treated as though they were the criminals and not the victims. She stated that she did not have a general bias against the sheriff's department based on that experience.

According to the trial court, prospective juror No. 1 informed "the staff" that her employer would not pay her beyond that day of voir dire. The trial court told the prospective juror that serving on a jury sometimes caused a financial burden and that such a burden was not a reason to excuse her. It asked prospective juror No. 1, "[I]f you are selected as a juror in this case, the fact that you are not being paid, is that going to weigh so heavily on you and any financial obligations you have—would that take your focus away from this trial?" The prospective juror responded, "Quite obviously. I pretty much live check to check, so being away from work for almost a week, that would be—I

9

mean that would be a burden upon me." After the trial court again stated that it would not excuse prospective juror No. 1, the prosecutor used a peremptory challenge to excuse the prospective juror. The prosecutor and defense counsel then accepted the panel as seated.

After the parties accepted the panel, the trial court began selection of the alternate jurors. With his first and second peremptory challenges, the prosecutor excused prospective juror Nos. 15 and 17. Defense counsel asked to approach the trial court and said, "I wanted to bring this to the court's attention. I note that the prosecution has just excused the last three jurors who were all Blacks. My client is Black and I don't see any other Black prospective jurors—I mean any other Black people who could possibly sit on this jury. [¶] It appears from the statements given by those jurors to the court's questioning, to [the prosecutor]'s questioning and my questioning, they appear to be appropriate. I guess you might say this is in the nature of a *Wheeler* motion and/or to protect the record, I'm putting the court on notice that my client is objecting that there are no Blacks."

The trial court asked the prosecutor if he had "[a]ny response?" The prosecutor said, "Yes. As to juror No. 1, who was the first of my last three challenges, I accepted her on the panel at least once and I note—I would ask the court to note that the only time I excused her was after she mentioned the fact that she would not be paid and that she would likely be distracted by the fact that she's missing a paycheck for a whole week. Otherwise I accepted her on the panel. [¶] As for juror No. 0353 [prospective juror No. 15], she was the first alternate that I excused. And throughout my observations, her arms are crossed. She did not want to be here. And if anyone else noticed when I excused her, she thanked me. And that was exactly my suspicion; she did not want to be here."

As for the prospective juror No. 17, the prosecutor explained, "[M]y primary concern with her, she said when law enforcement spoke with her and her daughter, they were treated poorly." The trial court responded, "Right." The prosecutor explained, "[O]ne of the key tactics, I believe, that the defense is going to take is my witnesses gave original statements. They are now recanting those statements, and they will say, from

10

what I understand, law enforcement are making all this up and they are mistreating us. And she's going to quickly associate with that against law enforcement, so those are my reasons for excusing those three jurors." The trial court found that the prosecutor had given "neutral responses." Defense counsel stated, "I just made a record. That's it."

### B. Application of Relevant Principles

Defendant contends that the trial court erred in denying his *Wheeler*/*Batson* motion because prospective juror No. 15's voir dire responses showed that she wanted to serve as a juror. Those responses showed, he contends, that prospective juror No. 15 "seemed pro-prosecution, had positive feelings toward the prosecutor's office and had negative feelings about private gun ownership."

The state and federal Constitutions prohibit an advocate from using peremptory challenges to exclude jurors based on race. (*People v. Lenix* (2008) 44 Cal.4th 602, 612 (*Lenix*), citing *Batson, supra,* 476 U.S. at p. 97 and *Wheeler, supra,* 22 Cal.3d at pp. 276-277.) "The exclusion by peremptory challenge of a single juror on the basis of race or ethnicity is an error of constitutional magnitude requiring reversal." (*People v. Silva* (2001) 25 Cal.4th 345, 386.) Parties are presumed to make peremptory challenges on constitutionally permissible grounds. (*Wheeler, supra,* 22 Cal.3d at p. 278.)

"The proper focus of a *Batson/Wheeler* inquiry, of course, is on the subjective *genuineness* of the race-neutral reasons given for the peremptory challenge, *not* on the objective *reasonableness* of those reasons. [Citation.]" (*People v. Reynoso* (2003) 31 Cal.4th 903, 924.) "All that matters is that the [stated] reason for exercising the peremptory challenge is sincere and legitimate, legitimate in the sense of being nondiscriminatory. '[A] "legitimate reason" is not a reason that makes sense, but a reason that does not deny equal protection. [Citations.]' [Citation.]" (*Ibid.*) "Review of a trial court's denial of a *Wheeler*/*Batson* motion is deferential, examining only whether substantial evidence supports its conclusions. [Citation.] . . . So long as the trial court makes a sincere and reasoned effort to evaluate the nondiscriminatory justifications

11

offered, its conclusions are entitled to deference on appeal. [Citation.]' [Citation]."
(*Lenix, supra,* 44 Cal.4th at pp. 613-614.)

A trial court employs a well-defined procedure for resolving a *Wheeler/Batson* motion. "First, the trial court must determine whether the defendant has made a prima facie showing that the prosecutor exercised a peremptory challenge based on race." (*Lenix, supra,* 44 Cal.4th at p. 612.) If a trial court asks the prosecutor to justify his or her peremptory challenges, the question of whether a prima facie showing has been made is considered moot or a finding of a prima facie showing is implicit in the trial court's request. (*People v. Welch* (1999) 20 Cal.4th 701, 745-746.) Second, if the defendant made a prima facie showing, "the burden shifts to the prosecutor to demonstrate that the challenges were exercised for a race-neutral reason. Third, the court determines whether the defendant has proven purposeful discrimination." (*Lenix, supra,* 44 Cal.4th at p. 612.) At the third stage, "'the issue comes down to whether the trial court finds the prosecutor's race-neutral explanations to be credible. Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy.' [Citation.]" (*Id.* at p. 613.) Credibility determinations "lie '"peculiarly within a trial judge's province,"'" and we defer to such determinations "'in the absence of exceptional circumstances.'" (*Id.* at p. 614.)

The prosecutor's explanation for excusing prospective juror No. 15 was her reluctance to serve on the jury. As set forth above, the prosecutor stated that "throughout [his] observations, [prospective juror No. 15's] arms are crossed. She did not want to be here. And if anyone else noticed when I excused her, she thanked me. And that was exactly my suspicion; she did not want to be here." Reluctance to serve on a jury is a nondiscriminatory reason supporting a peremptory challenge. (*People v. Garceau* (1993) 6 Cal.4th 140, 172, disapproved on another ground in *People v. Yeoman* (2003) 31 Cal.4th 93, 117-118; *People v. Walker* (1998) 64 Cal.App.4th 1062, 1070.) The trial court considered the prosecutor's proffered reason and found it race "neutral"—i.e., that the prosecutor's reason was credible. Because we defer, in the absence of exception

12

circumstances, to a trial court's determination that a prosecutor's proffered reason for excusing a juror was credible, we hold that the trial court did not err in denying defendant's *Wheeler*/*Batson* motion. (*Lenix, supra,* 44 Cal.4th at p. 614.)[6]

## II. Sufficiency of the Evidence in Support of Defendant's Attempted Murder Conviction and the Jury's Willful, Deliberate, and Premeditated Finding

Defendant contends that insufficient evidence supports his willful, deliberate, and premeditated attempted murder conviction because the prosecution failed to present sufficient evidence of his intent to kill. He further contends that insufficient evidence supports the jury's finding that he attempted to kill with premeditation. Sufficient evidence supports defendant's conviction and the jury's finding.

### A. *Standard of Review*

"'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' (*People v. Lindberg* (2008) 45 Cal.4th 1, 27 [82 Cal.Rptr.3d 323, 190 P.3d 664].) We determine 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' (*Jackson v.*

---

**6** Although defendant does not contend that the trial court erred in denying his *Wheeler*/*Batson* motion with respect to the prosecutor's use of peremptory challenges as to prospective juror Nos. 1 and 17, the prosecutor had legitimate, race neutral reasons for excusing prospective juror No. 1 (*People v. Chambie* (1987) 189 Cal.App.3d 149, 155, 157 [financial hardship was a nonracial ground for using a peremptory challenge to excuse a prospective juror]) and prospective juror No. 17 (*People v. Turner* (1994) 8 Cal.4th 137, 171 [the California Supreme Court has "repeatedly upheld peremptory challenges made on the basis of a prospective juror's negative experience with law enforcement. [Citations.]"], overruled on other grounds in *People v. Griffin* (2004) 33 Cal.4th 536, 555, fn. 5).

*Virginia* (1979) 443 U.S. 307, 319 [61 L.Ed.2d 560, 99 S.Ct. 2781].)  In so doing, a reviewing court 'presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.'  (*People v. Kraft* (2000) 23 Cal.4th 978, 1053 [99 Cal.Rptr.2d 1, 5 P.3d 68].)"  (*People v. Edwards* (2013) 57 Cal.4th 658, 715.)

"A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support"' the jury's verdict.  [Citation.]"  (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)  "Substantial evidence includes circumstantial evidence and the reasonable inferences flowing therefrom."  (*People v. Ugalino* (2009) 174 Cal.App.4th 1060, 1064.)  "We 'must accept logical inferences that the jury might have drawn from the circumstantial evidence. [Citation.]' [Citation.]"  (*People v. Zamudio, supra,* 43 Cal.4th at pp. 357-358.)  In determining whether substantial evidence supports a conviction, "we do not reweigh the evidence, resolve conflicts in the evidence, draw inferences contrary to the verdict, or reevaluate the credibility of witnesses."  (*People v. Little* (2004) 115 Cal.App.4th 766, 771, citing *People v. Jones* (1990) 51 Cal.3d 294, 314.)  We review a claim that insufficient evidence supports an enhancement using the same standard that we apply to a conviction.  (*People v. Wilson* (2008) 44 Cal.4th 758, 806.)

>       B.      *Application of Relevant Principles*
>               1.      Intent to kill

Defendant claims that there is insufficient evidence of intent to kill because the prosecution did not present evidence about the distance between defendant and the group of people at which he shot, that he intended the bullet to reach a member of the group, or that a bullet nearly struck a member of the group.  He also claims that his case should be "dismissed" because Guadiana's and Shirley's identifications of him as the shooter were inherently unreliable—they could not see the shooting and Detective Farrell coerced them into making their identifications.  There is sufficient evidence of intent to kill, and the identifications were not inherently unreliable.

14

"Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing."  (*People v. Superior Court* (*Decker*) (2007) 41 Cal.4th 1, 7; *People v. Nelson* (2011) 51 Cal.4th 198, 212.) "[A] person who intends to kill can be guilty of attempted murder even if the person has no specific target in mind.  An indiscriminate would-be killer is just as culpable as one who targets a specific person."  (*People v. Stone* (2009) 46 Cal.4th 131, 140; *People v. Perez* (2010) 50 Cal.4th 222, 230 ["a rational trier of fact could find that defendant's act of firing a single bullet at a group of eight persons from a distance of 60 feet established that he acted with intent to kill *someone* in the group he fired upon"].)  "'The act of firing toward a victim at a close, but not point blank, range "in a manner that could have inflicted a mortal wound had the bullet been on target is sufficient to support an inference of intent to kill . . . ." [Citation.]'  [Citations.]"  (*People v. Smith* (2005) 37 Cal.4th 733, 741.)  "[M]otive is often probative of an intent to kill."  (*People v. Houston* (2012) 54 Cal.4th 1186, 1218.)

The evidence shows that defendant had a motive to kill and was in close proximity to the crowd of people into which he fired his gun.  Defendant "hated" the people who lived on Stanridge Avenue.  He believed one of those persons was trying to "run the block" and had shot at defendant and his mother.  He stepped out of the house and engaged in an argument with the crowd of people in the front yard.  Defendant yelled, "Fuck you, fuck it," and fired a gun into the crowd.  Defendant was "not that far" from the crowd when he fired his gun.  Defendant's motive and close proximity to the group of people at which he shot provided the jury with sufficient evidence of an intent to kill. (*People v. Stone, supra,* 46 Cal.4th at p. 140; *People v. Perez, supra,* 50 Cal.4th at p. 230; *People v. Smith, supra,* 37 Cal.4th at p. 741; *People v. Houston, supra,* 54 Cal.4th at p. 1218.)

Defendant's claim that Guadiana's and Shirley's identifications of defendant as the shooter were inherently unreliable also fails.  The evidence shows that Guadiana and Shirley could see the shooting because they witnessed the shooting from a short distance—the shooting took place two houses from Guadiana's house.  Moreover,

15

Guadiana was close enough to defendant after the shooting that defendant could speak to her—Guadiana told Detective Farrell that defendant looked at her after the shooting and said, "It's just a [BB] gun." Also, it was the jury's task, and not ours, to resolve any credibility issues or evidentiary conflicts concerning whether Detective Farrell coerced Guadiana's and Shirley's identification. (*People v. Jones, supra,* 51 Cal.3d at p. 314; *People v. Little, supra,* 115 Cal.App.4th at p. 771.)

2.      Premeditation

Defendant argues that there is insufficient evidence of premeditation because the evidence showed that the "shooting occurred spontaneously in a fit of anger"—"some people argued, someone got a gun and fired a shot." Citing *People v. Anderson* (1968) 70 Cal.2d 15, 26-27 (*Anderson*), defendant argues that the prosecution failed to show premeditation through evidence of planning activity prior to the shooting, a motive to kill based on his prior relationship or conduct with the victim, and the manner of the attempted killing—i.e., whether the manner of the attempted killing indicated a preconceived design to kill in a certain way. There is sufficient evidence of premeditation.

"An intentional killing is premeditated and deliberate if it occurred as the result of reflection rather than unconsidered or rash impulse. [Citations.] However, the requisite reflection need not span a specific or extended period of time. Thoughts may follow each other with great rapidity, and cold, calculated judgment may be arrived at quickly. [Citations.]" (*People v. Nelson, supra,* 51 Cal.4th at p. 213.)

The *Anderson, supra,* 70 Cal.2d at pages 26-27, factors are not the exclusive means for establishing premeditation and deliberation. (*People v. Lenart* (2004) 32 Cal.4th 1107, 1127.) "Unreflective reliance on *Anderson* for a definition of premeditation is inappropriate." (*People v. Thomas* (1992) 2 Cal.4th 489, 517.) "A conviction will be upheld on any reasonable theory supported by substantial evidence. [Citations.]" (*People v. Nelson, supra,* 51 Cal.4th at p. 213.)

16

As discussed above, the evidence shows that defendant had a motive to kill—he said he hated the people who lived on Stanridge Avenue and believed one of them had shot at him and his mother. Defendant stepped out of the house and engaged in an argument with the crowd of people in the front yard. As defendant stood in the front yard, another male approached him from behind and handed him a gun. Defendant held the gun next to his right thigh as if he was trying to hide it. At some point, defendant yelled, "Fuck you, fuck it," and fired one shot at the crowd. As the crowd fled, defendant walked into the street and fired a second shot at the crowd. Such evidence sufficiently supports the jury's finding that defendant's decision to kill was "the result of reflection rather than unconsidered or rash impulse." (*People v. Nelson, supra,* 51 Cal.4th at p. 213.)

## III. Sufficiency of the Evidence in Support of Defendant's Assault With a Semiautomatic Firearm Conviction

Defendant argues that there is insufficient evidence to support his assault with a semiautomatic firearm conviction because the evidence failed to show that the "shooter willfully committed an act that by its nature would probably and directly result in a battery or injury to John Doe." We disagree.

The trial court instructed the jury on the elements of assault with a semiautomatic firearm as follows:

"1. The defendant did an act with a semiautomatic firearm that by its nature would directly and probably result in the application of force to a person;

"2. The defendant did that act willfully;

"3. When the defendant acted, he was aware of facts that would lead a reasonable person to realize that his act by its nature would directly and probably result in the application of force to someone;

"AND

"4. When the defendant acted, he had the present ability to apply force with a semiautomatic firearm to a person."

As explained above, there is sufficient evidence to support the jury's finding that defendant fired a gun into a crowd of people with premeditation and the intent to kill. The willful firing of a semiautomatic gun into a crowd of people from a short distance was an act that a reasonable person would realize would directly and probably result in the application of force to someone. Thus, there is sufficient evidence to support his conviction for assault with a semiautomatic firearm.

## IV.    Disclosure of Exculpatory Evidence

Defendant claims that his due process and fair trial rights were violated when the prosecution failed to disclose exculpatory crime scene photographs in violation of *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*).[7] Defendant raised this issue in the trial court in a motion to dismiss or for a new trial. Thus, although not expressly stated, defendant contends that the trial court erred in denying his motion to dismiss or for a new trial. Because there was no *Brady* violation, the trial court did not err in denying defendant's motion.

### A.    *Background*

After the verdict, defendant filed a motion to dismiss or for a new trial.[8] The motion alleged that on October 23, 2012, long after trial, the "police" produced 18

---

[7]    In this issue, defendant also mentions the prosecution's failure to disclose defendant's signed SHAD form (form waiving defendant's rights under *Miranda v. Arizona* (1966) 384 U.S. 436) and its late disclosure of the results of the fingerprint examination of the cigarette pack, but he never explains how that evidence was favorable to him or how he was prejudiced by the failure to produce the signed SHAD form or to produce earlier the fingerprint results—i.e. how they were *Brady* violations. Accordingly, defendant has forfeited any claimed *Brady* violation with respect to the SHAD form or fingerprint results. (*People v. Fiu* (2008) 165 Cal.App.4th 360, 381, fn. 26 ["We reject claims that are not carefully enough developed to be discrete contentions; contentions 'raised in such [a] perfunctory fashion [are] waived.' [Citations.]"].)

[8]    Defendant retained new defense counsel after the verdict who filed the motion to dismiss or for a new trial.

photographs in response to subpoenas issued to "Officers" Reddy and Shaffer. Among other things, the photographs showed knives, a broken glass table, pieces of broken glass, marks on the ground that defendant contends were blood drops, and a bullet casing. The motion alleged that the photographs were taken at night, depicted the crime scene close in time to the shooting, and would have allowed the defense to impeach prosecution witnesses by showing that the witnesses could not have seen anyone's face or the shooting. The motion further alleged that the photographs would have corroborated the deficiencies in the investigation by the "police."

### B. Application of Relevant Principles

The prosecution's suppression of evidence that is favorable to an accused, including impeachment testimony, violates the Fourteenth Amendment Due Process Clause where it is material either to issues of guilt or punishment, irrespective of the good faith of the prosecutor. (*Brady, supra,* 373 U.S. at p. 87; *United States v. Bagley* (1985) 473 U.S. 667, 675-676) (*Bagley*); see also *People v. Ochoa* (1998) 19 Cal.4th 353, 473 (*Ochoa* ).) Evidence is favorable to an accused if the defense could use it either to impeach the state's witnesses or to exculpate the accused. (*Bagley, supra,* 473 U.S. at p. 676; *Ochoa, supra,* 19 Cal.4th at p. 473.) Evidence is material "'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.' [Citation.]" (*Kyles v. Whitley* (1995) 514 U.S. 419, 433-434.) "A 'reasonable probability' is one sufficient to 'undermine[ ] confidence in the outcome.' (*United States v. Bagley, supra,* 473 U.S. at p. 678 [105 S.Ct. at p. 3381].)" (*Ochoa, supra,* 19 Cal.4th at p. 473.)

Thus, a "*Brady* violation occurs only when three conditions are met: 'The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.' (*Strickler v. Greene* (1999) 527 U.S. 263, 281-282 [4 L.Ed.2d 286, 119 S.Ct. 1936].) Under this standard prejudice focuses on 'the materiality of the evidence to the issue of guilt or innocence.' (*United*

19

*States v. Agurs* [(1976)] 427 U.S. [97,] 112, fn. 20.) In the case of impeachment evidence, materiality requires more than a showing that 'using the suppressed evidence to discredit a witness's testimony "*might* have changed the outcome of the trial." [Citation.]' (*People v. Salazar* [(2005)] 35 Cal.4th [1031,] 1043, italics added.) Rather, the evidence will be held to be material 'only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.' (*United States v. Bagley* (1985) 473 U.S. 667, 682 [87 L.Ed.2d 481, 105 S.Ct. 3375].)" (*People v. Lucas* (2014) 60 Cal.4th 153, 274.)

As in the trial court, defendant contends that the photographs were material because they showed the crime scene after the shooting, which, he claims, defense counsel could have used to impeach the prosecution's witnesses by showing that they "could not have seen anything." The photographs showed, defendant asserts, the scene at night and a garage that obstructed the view of the front of the house where the shooting took place. Defendant also contends that the photographs would have corroborated the deficiencies in the "police" investigation. The investigation was deficient, defendant contends, because "[i]nstead of taking photographs of the entire street and asking the witnesses to show them where everything happened, eight of the pictures showed broken glass and some blood drops on the floor. The pictures fail to show any blood trail leading to the Ortega house. The pictures show two knives on the ground, in two separate places, but with no context where the police found the knives. . . . The police failed to place markers behind or next to any of the evidence depicted so that the evidence could be easily referenced."

The photographs were not material, and thus there was no *Brady* violation because there is no reasonable probability that the result would have been different if the photographs had been disclosed to defendant. (*People v. Lucas, supra,* 60 Cal.4th at p. 274.) While some of the photographs apparently depicted the crime scene as it appeared shortly after the shooting, those photographs merely show that it was dark outside. Guadiana testified that it was nighttime and dark outside when she and Shirley returned home from the store. That it was dark outside did not establish that Guadiana and Shirley

20

were unable to see and identify defendant. Moreover, Guadiana told Detective Farrell that after defendant followed the group into the street fired two shots, defendant looked at her and said, "It's just a [BB] gun"—that is, that defendant had moved close enough to Guadiana to speak to her. The photographs also do not show exactly where Guadiana and Shirley stood relative to the shooter and the group of males—i.e., whether they stood at an angle such that any outside light illuminated the shooter's face.

Even if defendant could have used some of the photographs to "corroborate" that the "police" investigation was deficient, those photographs were not material because two eyewitnesses—Guadiana and Shirley—independently identified defendant as the shooter. That is, notwithstanding any deficiencies in the investigation, there is no reasonable probability that the result would have been different if the prosecution had disclosed the photographs to defendant in light of Guadiana's and Shirley's independent identifications of defendant as the shooter. (*People v. Lucas, supra,* 60 Cal.4th at p. 274.)


## V. Ineffective Assistance of Counsel

Defendant contends that defense counsel provided ineffective assistance of counsel by failing to visit and take photographs of the crime scene. Based on photographs taken by his cousin after the verdict and over two years after the shooting, he claims that crime scene photographs would have "proved" that Guadiana and Shirley could not have seen the shooter due to obstructions and poor lighting.[9]

"When a claim of ineffective assistance is made on direct appeal, and the record does not show the reason for counsel's challenged actions or omissions, the conviction must be affirmed unless there could be no satisfactory explanation. [Citation.]" (*People v. Anderson* (2001) 25 Cal.4th 543, 569.) "A claim of ineffective assistance in such a case is more appropriately decided in a habeas corpus proceeding." (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-267.) The record on appeal does not reveal whether defense counsel visited the crime scene or whether he took photographs of the crime

---

**9** The photographs were taken at the request of defense counsel who substituted in as defendant's attorney after the jury's verdict.

21

scene. It also does not reveal why defense counsel did not visit the crime scene if he did not visit or why he did not take and introduce photographs of the crime scene if he did visit. Accordingly, any claim of ineffective assistance with respect to the claimed deficiencies is better suited to a petition for writ of habeas corpus. (*People v. Anderson, supra,* 25 Cal.4th at p. 569; *People v. Mendoza Tello, supra,* 15 Cal.4th at p. 267.)

## VI. Gang Evidence

Defendant contends that he was denied a fair trial and due process when Detective Farrell "blurted out" that defendant belonged to a gang. Because the trial court immediately struck Detective Farrell's testimony and subsequently instructed the jury to disregard and not consider for any purpose testimony that the trial court had ordered stricken, defendant suffered no prejudice.

### A. Background

On cross-examination, defense counsel and Detective Farrell engaged in the following colloquy:

"[Defense counsel]: [¶] This young man, Ruben Abelar, is he a member of a gang?

"[Detective Farrell]: It's a rival gang to your client's.

"Q My client? I see. So what is the gang he's in?

"A. I believe it's C.K.F. I would have to double-check. I wasn't prepared.

"Q What is C.K.F.?

"The Court: When you say 'he,' do you mean your client or Ruben?

"[Defense counsel]: Your Honor, I move to strike the answer with respect to rivals. I just asked if he was a member of a gang.

"The Court: Well, that's true. Anything after the answer 'yes' is ordered stricken.

"[Defense counsel]: So, what gang do you know Abelar to be a member of?

"[Detective Farrell]: I am assuming C.K.F.

"The Court: Now, do you know?

22

"[Detective Farrell]: Not off the top of my head.

"The Court: That answer is stricken as well."

At the end of the case, the trial court instructed the jury that it was to disregard and not consider for any purpose testimony that the trial court ordered stricken.

### B.     Application of Relevant Principles

Evidence that a criminal defendant is a gang member may have a "'highly inflammatory impact'" on the jury. (*People v. Gurule* (2002) 28 Cal.4th 557, 653.) Accordingly, a trial court should not admit such evidence if it is only tangentially relevant because of the possibility that the jury will improperly infer that the defendant is guilty of the charged offense due to a criminal disposition.[10] (*Ibid.*)

Defendant contends that Detective Farrell's statement that he belonged to a gang that was a rival to Abelar's gang implied that he must have committed the shooting as part of a gang rivalry. According to defendant, the gang reference showed a "motive to shoot at the crowd because the people may have been members of Abelar's criminal street gang." Although the trial court struck the objectionable testimony, defendant contends, the trial court's "admonition could not drive it from the jurors' minds." Defendant argues that because striking Detective Farrell's testimony and even an instruction to the jury to disregard the testimony were inadequate to cure the prejudice, the only adequate cure would have been a mistrial. Defense counsel did not, however, move for a mistrial.

Defendant has not shown that he was prejudiced by Detective Farrell's brief, unsolicited statement about defendant's gang membership. Detective Farrell did not state the name of defendant's gang or provide any other details about that gang, its activities, or defendant's membership. When defense counsel objected to Detective Farrell's gang

---

**10**     Although this case concerns the unsolicited introduction of gang evidence that was stricken and not a trial court's admission of gang evidence, the potential prejudicial effect of gang membership information would appear to be the same regardless of how the jury received such information.

23

statement testimony, apparently on the ground that it was non-responsive to defense counsel's question about Abelar's gang membership, the trial court ordered the gang reference stricken. Later, the trial court instructed the jury to disregard and not consider for any purpose testimony that the trial court ordered stricken. We presume that jurors understand and follow the trial court's instructions. (*People v. Pearson* (2013) 56 Cal.4th 393, 414.) Defendant does not cite any part of the record that indicates that the jury was unable to or failed to follow the trial court's instruction. (*People v. Martin* (1983) 150 Cal.App.3d 148, 163 ["Juries often hear unsolicited and inadmissible comments and in order for trials to proceed without constant mistrial, it is axiomatic the prejudicial effect of these comments may be corrected by judicial admonishment; absent evidence to the contrary the error is deemed cured. [Citations.]"].)

## VII. Unanimity Instruction

Defendant contends that the trial court erred in failing, sua sponte, to give the jury a unanimity instruction[11] because the prosecutor "argued that the shooter fired three shots and tried to kill more than one person." Defendant argues that "[w]ithout a unanimity instruction, the jurors could amalgamate the evidence of the number of shots and the number of intended victims to find [him] guilty." The trial court did not err.

"As a general rule, when violation of a criminal statute is charged and the evidence establishes several acts, any one of which could constitute the crime charged, either the state must select the particular act upon which it relied for the allegation of the information, or the jury must be instructed that it must agree unanimously upon which act to base a verdict of guilty. (*People v. Diedrich* (1982) 31 Cal.3d 263, 281 [182 Cal.Rptr. 354, 643 P.2d 971].) There are, however, several exceptions to this rule. For example, no unanimity instruction is required if the case falls within the continuous-course-of-

---

[11] CALCRIM No. 3500 provides in part: "The People have presented evidence of more than one act to prove that the defendant committed this offense. You must not find the defendant guilty unless you all agree that the People have proved that the defendant committed at least one of these acts and you all agree on which act (he/she) committed."

24

conduct exception, which arises 'when the acts are so closely connected in time as to form part of one transaction' (*People v. Crandell* (1988) 46 Cal.3d 833, 875 [251 Cal.Rptr. 227, 760 P.2d 423]) . . . . There also is no need for a unanimity instruction if the defendant offers the same defense or defenses to the various acts constituting the charged crime. (*People v. Carrera* (1989) 49 Cal.3d 291, 311-312 [261 Cal.Rptr. 348, 777 P.2d 121].)"**12** (*People v. Jennings* (2010) 50 Cal.4th 616, 679; *People v. Ervine* (2009) 47 Cal.4th 745, 755, 788 [in a prosecution for three counts of attempted murder where multiple gunshots were fired at three sheriff's deputies over 10 to 15 seconds, the Supreme Court rejected the defendant's claim that the jurors should have been required unanimously to agree which act or event established each count of attempted murder]; *People v. Bui* (2011) 192 Cal.App.4th 1002, 1011 [the continuous conduct "exception "'is meant to apply not to all crimes occurring during a single transaction but only to those 'where the acts testified to are so closely related in time and place that the jurors reasonably must either accept or reject the victim's testimony in toto.' [Citation.]" [Citation.]' [Citation.]"]; *People v. Percelle* (2005) 126 Cal.App.4th 164, 181-182 ["It is immaterial that the two acts might have been charged as two separate attempts. If there was no evidence from which the jury could have found defendant was guilty of one attempt and not the other, the instruction is not required. [Citation.]"].) The trial court has a sua sponte duty to give the jury a unanimity instruction when appropriate under the facts of the case. (*People v. Riel* (2000) 22 Cal.4th 1153, 1199.)

The trial court did not err in not giving the jury, sua sponte, a unanimity instruction. The evidence showed that defendant shot at the group of males three times in a short time span. Defendant fired the first shot in the front yard. When that shot caused the group to run, he followed the group into the street and fired two additional shots. The three shots fired at a group of people within a brief period of time were part of a course of conduct that constituted one transaction. Also, defendant provided the same alibi defense to all three gunshots—he was at home with his wife and children at the time of the

---

**12** *People v. Crandell, supra,* 46 Cal.3d 833 was abrogated on another ground in *People v. Crayton* (2002) 28 Cal.4th 346, 364-365.

25

shooting. Because the three gunshots were part of a continuous course of conduct and defendant provided the same defense to each of the gunshots, the trial court did not err in not giving the jury, sua sponte, a unanimity instruction. (*People v. Jennings, supra,* 50 Cal.4th at p. 679; *People v. Ervine, supra,* 47 Cal.4th p. 788; *People v. Bui, supra,* 192 Cal.App.4th at p. 1011; *People v. Percelle, supra,* 126 Cal.App.4th at pp. 181-182.)

## VIII.  Cumulative Error

Defendant contends that even if any of the claimed errors individually does not mandate reversal, the cumulative effect of such errors denied him his due process right to a fair trial. Because we reject or find harmless each of defendant's contended errors, there is no cumulative prejudicial effect justifying reversal.

### DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


MOSK, J.


We concur:


TURNER, P. J.


KRIEGLER, J.


26